THE HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| INTERNATIONAL FRANCHISE ASSOCIATION, INC.; CHARLES STEMPLER; KATHERINE LYONS; MARK LYONS; MICHAEL PARK; and RONALD OH,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF SEATTLE, a municipal corporation; and FRED PODESTA, Director of the Department of Finance and Administrative Services,<br><br>Defendants. | NO. 2:14-CV-00848-RAJ<br><br>National Employment Law Project's Motion for Leave to File Amicus Brief<br><br>NOTED FOR CONSIDERATION: October 17, 2014 |

The National Employment Law Project ("NELP") respectfully moves, pursuant to the Court's inherent authority, to file a brief as *amicus curiae* regarding the economic impact on employers, workers and the economy of the Seattle minimum wage ordinance as such impacts relate to the irreparable injury and the public interest prongs of the preliminary injunction standard. In particular, the brief responds to the erroneous assertions regarding such impacts

made in the opposing amicus brief of the Chamber of Commerce of the United States of America, et al. A copy of the proposed brief is attached as Exhibit A to this motion.

As detailed in the accompanying Declaration of Rebecca Smith, counsel for the National Employment Law Project, Pursuant to this Court's Standing Order on Amicus Briefs, has met and conferred with counsel for plaintiffs and with counsel for defendants, and with counsel for the two other proposed amici supporting the position of defendants. First, counsel for both sets of parties – plaintiffs and defendants – do not object to the filing of this amicus brief. Second, based on those meet and confer sessions, we certify that our proposed amicus brief addresses a narrow issue and provides argument and authority that is not duplicative of that presented by any party.

## I. IDENTIFY AND INTEREST OF AMICUS

NELP is a national research and policy organization known for its expertise on workforce issues. Relevant to this matter, NELP has worked with most of the cities in the United States that have adopted higher city minimum wages in recent years and is generally regarded as a national expert on such policies. As a result, NELP is familiar with the economic experiences of cities with higher local minimum wages, and with the research evidence on the impact that such policies have had on employers, workers and local economies. We believe that this information is likely to be helpful to the Court, is not being presented by any other party, and relates directly to the irreparable injury and public interest factors of the preliminary injunction standard. NELP also has an interest in ensuring that the Seattle minimum wage ordinance is fully enforced

according to its terms, and that the constitutional and other challenges to its implementation be rejected as without legal basis.

## II. THE PROPOSED NATIONAL EMPLOYMENT LAW PROJECT AMICUS BRIEF PROVIDES FACTS REGARDING THE LIKELY ECONOMIC IMPACT OF THE SEATTLE ORDINANCE, BASED ON ECONOMIC RESEARCH AND THE EXPERIENCES OF OTHER CITIES, THAT RELATES TO THE PRELIMINARY INJUNCTION FACTORS, IS NOT BEING PRESENTED BY ANY OTHER PARTY SUPPORTING DEFENDANTS, AND RESPONDS TO THE ASSERTIONS IN THE CHAMBER OF COMMERCE AMICUS BRIEF SUPPORTING PLAINTIFFS

The proposed NELP amicus brief provides facts regarding the likely economic impact of the Seattle minimum wage ordinance on employers, workers and the economy, based on economic research on minimum wage laws and the experiences over the past decade of cities such as San Francisco, San Jose, Santa Fe, SeaTac and others that have adopted such local measures. This is relevant factual information that NELP is well qualified to present drawing on our extensive experience with minimum wage policy and our work in other cities. It is information that relates to plaintiffs' claims regarding the irreparable injury and public interest prongs of the preliminary injunction standard, and that is not being addressed by defendants or by either of the other amicus briefs supporting the defendants. This information is also important for responding to the erroneous assertions regarding economic impact that have been made by amici Chamber of Commerce, et al., who are supporting plaintiffs' position.

## III. REASONS WHY THE MOTION SHOULD BE GRANTED

District courts possess the inherent authority to consider amicus briefs from non-parties "concerning legal issues that have potential ramifications beyond the parties directly involved or if the amicus has 'unique information or perspective that can help the court beyond the help that the lawyers for the parties are able to provide.'" *Skokomish Indian Tribe v. Goldmark*, 2013 WL 5720053, at *1 (W.D. Wash. 2013) (quoting *NGV Gaming, Ltd. V. Upstream Point Molate, LLC*, 355 F. Supp. 2d 1061, 1067 (N.D. Cal. 2005)). The role of an amicus is to assist the Court "in cases of general public interest by making suggestions to the court, by providing supplementary assistance to existing counsel, and by insuring a complete and plenary presentation of difficult issues so that the court may reach a proper decision." *Newark Branch, N.A.A.C.P. v. Harrison*, 940 F.2d 792, 808 (3d Cir. 1991). The Court has "broad discretion to appoint amicus curiae." *Skokomish Indian Tribe*, 2013 WL 5720053, at *1 (citation omitted).

For the foregoing reasons, proposed amicus National Employment Law Project respectfully submits that our motion for leave to file an amicus brief should be GRANTED and the accompanying brief ACCEPTED for filing.

RESPECTFULLY SUBMITTED this 3rd day of October, 2014.

s/ Rebecca Smith
Rebecca Smith, WSBA # 12834
National Employment Law Project
317 17th Ave. S.
Seattle, WA 98144
Tel: (206) 324-4000
Fax: (212) 285-3044
Email: rsmith@nelp.org

Paul K. Sonn, NYS Atty. Reg. # 2644516
National Employment Law Project
75 Maiden Lane, Suite 601
New York, NY 10038
Tel: (212) 285-3025 ext. 351
Fax: (212) 285-3044
Email: psonn@nelp.org

Attorneys for Amicus
National Employment Law Project

# Exhibit A

THE HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| INTERNATIONAL FRANCHISE ASSOCIATION, INC.; CHARLES STEMPLER; KATHERINE LYONS; MARK LYONS; MICHAEL PARK; and RONALD OH,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF SEATTLE, a municipal corporation; and FRED PODESTA, Director of the Department of Finance and Administrative Services,<br><br>Defendants. | NO. 2:14-CV-00848-RAJ<br><br>National Employment Law Project's Amicus Brief<br><br>NOTED FOR CONSIDERATION: October 17, 2014 |

**Summary**

The amicus brief of the Chamber of Commerce of the United States of America, et al. ("Chamber of Commerce Amicus"), filed in support of plaintiffs' motion for a preliminary injunction, contends that the Seattle minimum wage ordinance will irreparably harm franchisee employers and adversely affect the public interest, and that a preliminary injunction is therefore warranted. Specifically, the Chamber of Commerce Amicus charges that the ordinance will

impose unmanageable costs on franchisee employers in the City of Seattle, place them in an untenable competitive posture with respect to other employers, and harm workers by causing employers to hire fewer workers, especially younger workers.

However, as explained in this amicus brief submitted by the National Employment Law Project, those claims are without factual basis, and fly in the face of the most rigorous economic research on the impact of higher minimum wages as well as the real world experiences over the past decade in cities that have successfully implemented higher local minimum wages. Specifically (1) the most rigorous modern research on the impact of minimum wages shows that they raise worker earnings with negligible adverse impact on employment levels; (2) as more and more U.S. cities have enacted local minimum wages, the research has similarly shown that such local measures have no adverse effect on jobs and implementation of higher local wages has proven manageable for employers; (3) in locations where some employers are covered by a higher minimum wage while others are not, the employers that are covered have *not* found themselves placed at a competitive disadvantage – instead non-covered employers have generally found themselves forced to match the higher wages in order to compete for employees; and (4) the benefits for low-wage workers and their families of higher wages have been very significant, reducing economic hardship, lifting workers out of poverty, and improving other life outcomes. In light of these facts, it is clear that plaintiffs will not be irreparably harmed by allowing the Seattle minimum wage ordinance to take effect, and that allowing the ordinance to take effect will substantially benefit the public interest.

## Interest of Amicus Curiae

The National Employment Law Project (NELP) is a national research and policy organization known for its expertise on workforce issues. NELP works with federal, state and local policymakers on matters ranging from unemployment insurance and workforce development, to wage and hour and benefits policy. Relevant to this matter, NELP has worked with most of the cities in the United States that have adopted higher city minimum wages in recent years and is familiar with their economic experiences. NELP has an interest in ensuring that the Seattle minimum wage ordinance is fully enforced according to its terms, and that the constitutional and other challenges to its implementation be rejected as without legal basis.

### I. The Most Rigorous Research Shows That Higher Minimum Wages Raise Worker Incomes without Reducing Employment

The most rigorous research over the past 20 years – examining scores of state and local minimum wage increases across the U.S. – demonstrates that these increases have had the effect of raising workers' incomes *without* reducing employment. This substantial weight of scholarly evidence reflects a significant shift in the views of the economics profession, away from a former view that higher minimum wages cost jobs. As Bloomberg News summarized in 2012:

> [A] wave of new economic research is disproving those arguments about job losses and youth employment. Previous studies tended not to control for regional economic trends that were already affecting employment levels, such as a manufacturing-dependent state that was shedding jobs. The new research looks at micro-level employment patterns for a more accurate employment picture. The studies find minimum-wage increases even provide an economic boost, albeit a small one, as strapped workers immediately spend their raises.

"Raise the Minimum Wage," Bloomberg News (Apr. 16, 2012).[1]

The most sophisticated of the new wave of minimum wage studies, "Minimum Wage Effects Across State Borders," was published in 2010 by economists at the Universities of California, Massachusetts and North Carolina in the prestigious *Review of Economics and Statistics*. Arindrajit Dube, T. William Lester, and Michael Reich, "Minimum Wage Effects Across State Borders: Estimates Using Contiguous Counties," The Review of Economics and Statistics, 92(4): 945–964 (Nov. 2010).[2] That study carefully analyzed minimum wage impacts across state borders by comparing employment patterns in more than 250 pairs of neighboring counties in the U.S. that had different minimum wage rates between 1990 and 2006 as the result of being located in neighboring states with different minimum wages. This study's innovative approach of comparing neighboring counties on either side of a state line is generally recognized as especially effective at isolating the true impact of minimum wage differences, since neighboring counties otherwise tend to have very similar economic conditions, and has been lauded as the state-of-the-art by the nation's top labor economists such as Harvard's Lawrence Katz, MIT's David Autor, and MIT's Michael Greenstone. See NELP Summary, supra note 2, at 2. By contrast, studies such as those cited by the Chamber of Commerce that compare one state to another – and especially those comparing states in different regions of the U.S. – cannot as effectively isolate the impact of the minimum wage, because different states face different economic conditions, of which varying minimum wage rates is but one.

---

[1] Available at http://www.bloomberg.com/news/2012-04-16/u-s-minimum-wage-lower-than-in-lbj-era-needs-a-raise.html

[2] A summary of the study prepared by NELP is *available at* http://nelp.3cdn.net/98b449fce61fca7d43_j1m6iizwd.pdf

Consistent with a long line of similar research, the Dube, Lester & Reich study found no difference in job growth rates in the data from the 250 pairs of neighboring counties – such as Washington State's Spokane County with Idaho's Kootenai County where the minimum wage was substantially lower -- and found no evidence that higher minimum wages harmed states' competitiveness by pushing businesses across the state line.[3]

However, it is not simply individual state-of-the-art studies, but the whole body of the most rigorous modern research on the minimum wage that now indicates that higher minimum wages have had little impact on employment levels. This is most clearly demonstrated by several recent "meta-studies" surveying research in the field. For example, a meta-study of 64 studies of the impact of minimum wage increases published in the British Journal of Labor Relations in 2009 shows that the bulk of the studies find close to no impact on employment. Hristos Doucouliagos & T.D. Stanley, "Publication Selection Bias in Minimum-Wage Research? A Meta-Regression Analysis," British J. of Indus. Relations, Vol. 47, Iss. 2, May 2009. This is vividly illustrated by a graph from the meta-study showing the results clustered around zero:

---

[3] Similar, sophisticated new research has also focused in particular on teen workers – a very small segment of the low-wage workforce affected by minimum wage increases, but one that is presumed to be especially vulnerable to displacement because of their lack of job tenure and experience. However, the research has similarly found no evidence that minimum wage increases in the U.S. in recent years have had any adverse effect on teen employment. See Sylvia Allegretto, Arindrajit Dube, and Michael Reich "Do Minimum Wages Reduce Teen Employment?," Industrial Relations, vol. 50, no. 2 (Apr. 2011). NELP Summary available at http://nelp.3cdn.net/eb5df32f3af67ae91b_65m6iv7eb.pdf




Another recent meta-study of the minimum wage literature demonstrates similar results. Paul Wolfson & Dale Belman, "What Does the Minimum Wage Do?," Upjohn Inst. for Employ. Res. (2014).

Amicus Chamber of Commerce, which fails to cite this substantial body of economic evidence, relies instead on a review of the minimum wage literature by David Neumark and William Wascher, which erroneously claims that most minimum wage studies point towards job losses. However, as more careful economists have noted, the Neumark and Wascher survey is not reliable because it is subjective (rather than a scientific meta-study), relies in large part on studies of wage increases in foreign countries, and fails to include most of the most sophisticated and recent studies. John Schmitt, "Studying the Studies on the Minimum Wage," Center for Economic & Policy Research (Feb. 26, 2013).[4]

[4] Available at http://www.cepr.net/index.php/blogs/cepr-blog/studying-the-studies-on-the-minimum-wage . See also John Schmitt, "Why Does the Minimum Wage Have No Discernible Impact on Employment?,"

Further underscoring how minimum wage increases are simply not a major factor affecting job growth, economists at the Center for Economic & Policy Research and Goldman Sachs have noted that the U.S. states that have raised their minimum wages above the minimal federal level are enjoying stronger job growth this year than those that have not. Center for Economic & Policy Research, "2014 Job Creation Faster in States that Raised the Minimum Wage."[5]

**II. The Evidence from Cities That Have Adopted Significantly Higher Local Minimum Wages Similarly Shows That They Have Not Cost Jobs and That Implementation Has Proven Manageable for Employers**

Over the past decade, growing numbers of U.S. cities have, like Seattle, pursued higher minimum wages at the local level, in an effort to respond to higher local living costs and to bring the minimum wage closer to a self-sufficiency level. See NELP, "Minimum Wage Laws and Proposals for Major U.S. Cities."[6] The experiences of these cities – and the most rigorous economic research on the impact of city wage laws – have shown that they have raised wages broadly without slowing job growth or hurting local employers.

The two U.S. cities that have had higher local minimum wages for the longest period are San Francisco, California and Santa Fe, New Mexico. Both adopted significantly higher local minimum wages in 2003 and the impact of the minimum wages has been the subject of sophisticated economic impact studies. In San Francisco, a 2007 study by University of California researchers gathered employment and hours data from restaurants in San Francisco as

---

Center for Econ. & Policy Research, at 6-7 (Feb. 2013), available at http://www.cepr.net/documents/publications/min-wage-2013-02.pdf.

[5] Available at http://www.cepr.net/index.php/blogs/cepr-blog/2014-job-creation-in-states-that-raised-the-minimum-wage

[6] Available at http://raisetheminimumwage.org/pages/minimum-wage-laws-and-proposals-for-major-u.s.-cities

well as from surrounding counties that were not covered by the higher minimum wage and found that the higher wage had not led San Francisco employers to reduce either their employment levels or employee hours worked. Michael Reich, Arindrajit Dube & Suresh Naidu, "The Economic Effects of a Citywide Minimum Wage," Univ. of Calif.-Berkeley (2007).[7] A follow-up 2014 study examined the combined impact on San Francisco employers of the city's minimum wage ordinance and of other city compensation mandates that cumulatively raised employment costs 80% above the level of the federal minimum wage. The study again found no adverse affect on employment levels or hours, and found that food service jobs – the sector most heavily affected – actually grew 17% faster in San Francisco than surrounding counties during that period. Michael Reich, Ken Jacobs & Miranda Dietz (eds.), When Mandates Work: Raising Labor Standards at the Local Level, Univ. of Calif. Press (2014), at 31.[8]

In Santa Fe, a similar 2006 study after the city raised its minimum wage 65% above the state rate compared job growth in Santa Fe with that in Albuquerque (which at that time did not have a higher city minimum wage). It determined that "[o]verall, this analysis found that the living wage had no discernible impact on employment per firm, and that Santa Fe actually did better than Albuquerque in terms of employment changes." "Measuring the Employment Impacts of the Living Wage Ordinance in Santa Fe, New Mexico," Univ. of New Mexico, Bureau of Bus. & Econ. Research (June 30, 2006). [9]

---

[7] Available at: http://www.irle.berkeley.edu/cwed/wp/economicimpacts_07.pdf

[8] Available at http://irle.berkeley.edu/publications/when-mandates-work/. See also "San Francisco's Higher Minimum Wage Hasn't Hurt the Economy," Business Week (January 22, 2014), available at http://www.businessweek.com/articles/2014-01-22/san-franciscos-higher-minimum-wage-hasnt-hurt-the-economy; "S.F. praised as model for U.S. on increasing minimum wage," SF Gate (January 28, 2014), available at http://www.sfgate.com/politics/article/S-F-praised-as-model-for-U-S-on-increasing-5183378.php

[9] Available at: http://bber.unm.edu/pubs/EmploymentLivingWageAnalysis.pdf

Finally, a sophisticated 2011 study of higher minimum wages in San Francisco, Santa Fe and Washington, D.C. compared employment impacts to control groups in surrounding suburbs and cities. It similarly found that "The results for fast food, food services, retail, and low-wage establishments . . . support the view that citywide minimum wages can raise the earnings of low-wage workers, without a discernible impact on their employment …." John Schmitt & David Rosnick, "The Wage and Employment Impact of Minimum-Wage Laws in Three Cities," Center for Econ. & Policy Research (Mar. 2011), at 1.[10] For a helpful overview of this literature on the impact of city minimum wages, see Michael Reich, Ken Jacobs & Annette Bernhardt, "Local Minimum Wage Laws: Impacts on Workers, Families and Businesses: Report prepared for the Seattle Income Inequality Advisory Committee," (Mar. 2014), at 17-19.[11]

The Chamber of Commerce amicus brief cites a survey of Seattle businesses by the restaurant industry-backed Employment Policies Institute in which large percentages of Seattle employers predict that they will be forced to reduce employee hours or reduce job positions in order to adjust to the higher minimum wage. Chamber of Commerce Amicus at p. 8. It is not surprising that employers who are uncertain about the future might make such predictions. But when higher minimum wages are actually phased in, the real-world data from other cities shows that such predictions have not been borne out.

For example, in San Jose, California, business groups made similar predictions before the voters in 2012 approved raising the city's minimum wage. But the actual results did not bear out those fears. As the Wall Street Journal reported this spring, "Fast-food hiring in the region

---

[10] Available at http://www.cepr.net/documents/publications/min-wage-2011-03.pdf

[11] Available at http://murray.seattle.gov/wp-content/uploads/2014/03/UC-Berkeley-IIAC-Report-3-20-2014.pdf

accelerated once the higher wage was in place. By early this year, the pace of employment gains in the San Jose area beat the improvement in the entire state of California." Eric Morath, "What Happened to Fast-Food Workers When San Jose Raised the Minimum Wage? Hold the Layoffs", *Wall Street Journal* (April 9, 2014).[12] USA Today similarly found, "Interviews with San Jose workers, businesses, and industry officials show [the city minimum wage] has improved the lives of affected employees while imposing minimal costs on employers." Paul Davidson, "In San Jose, Higher Minimum Wage Pays Benefits," *USA Today* (June 14, 2014).[13]

The same pattern of dire predictions followed by manageable real world implementation was repeated this past year when SeaTac, Washington phased in its $15 minimum wage – the nation's first at that level. As the Seattle Times reported, "For all the political uproar it caused, SeaTac's closely watched experiment with a $15 minimum wage has not created a large chain reaction of lost jobs and higher prices …." Amy Martinez, "$15 Wage Slowly Takes Hold in SeaTac," *Seattle Times* (June 3, 2014).[14] The Washington Post confirmed "Those who opposed the $15 wage in SeaTac and Seattle admit there has been no calamity so far." Dana Milbank, "No Calamity Yet as SeaTac, WA, Adjusts to $15 Minimum Wage," *Washington Post* (Sept. 5, 2014).[15]

---

[12] Available at: http://blogs.wsj.com/economics/2014/04/09/what-happened-to-fast-food-workers-when-san-jose-raised-the-minimum-wage/

[13] Available at: http://www.usatoday.com/story/money/business/2014/06/14/minimum-wage-san-jose/9968679/

[14] Available at: http://seattletimes.com/html/localnews/2022905775_seatacprop1xml.html

[15] Available at: http://www.washingtonpost.com/opinions/dana-milbank-no-calamity-yet-as-seatac-wash-adjusts-to-15-minimum-wage/2014/09/05/d12ba922-3503-11e4-9e92-0899b306bbea_story.html

### III. Coverage Distinctions Have Not Proven Harmful for Employers Subject to a Higher Minimum Wage or Faster Phase-In

The Chamber of Commerce argues that if the ordinance goes into effect and requires franchisee employers in Seattle that are part of franchise networks with over 500 employees to pay a higher minimum wage sooner than small independent employers, those franchisee employers will be placed in an untenable competitive posture. Like the Chamber's other dire warnings, this prediction is belied by real-world evidence.

It is not uncommon for some employers to be subject to differing minimum wage rates from other employers with which they compete. This happens frequently, for example, when city or state boundaries mean that certain employers are subject to a higher city or state minimum wage, while competitors located a short distance away are not. It also happens when large and small employers are subject to differing wage rates, phase-ins, or coverage, as is the case under many wage laws. See, e.g., federal Fair Labor Standards Act, 29 U.S.C. § 203(s)(1)(A)(ii) (exempting smaller employers with less than $500,000 in annual revenue); Minnesota minimum wage law, Minn. Stat. 2012, § 177.24(1)(a) (differing rates for employers with more than $500,000 in annual sales and those with less); Santa Fe minimum wage ordinance, Santa Fe Ord. #2003-8 (exempting employers with fewer than 25 employees until was amended in 2007); San Francisco minimum wage ordinance, San Francisco Admin Code § 12R.4(c) (gradually phasing in minimum wage for employers with fewer than 10 employees).

Contrary to the predictions made by the Chamber of Commerce, actual experiences on the ground shows that such differentials are manageable for employers. In particular, experiences show that the employers that are not covered often feel pressure to raise wages in

order to compete with their competitors that are covered, even though they are not legally obligated to do so.

The classic illustration of this phenomenon is the much-reported impact of Washington State's minimum wage – which is substantially higher than Idaho's – on fast food employers along the Washington/Idaho border. Back in 2007, when Idaho's minimum wage was $5.15 and Washington's was 54% higher at $7.93, the New York Times interviewed restaurant employers and workers in small towns along the border:

> Nearly a decade ago, when voters in Washington approved a measure that would give the state's lowest-paid workers a raise nearly every year, many business leaders predicted that small towns on [the Washington] side of the state line would suffer. But instead of shriveling up, small-business owners in Washington say they have prospered far beyond their expectations. In fact, as a significant increase in the national minimum wage heads toward law, businesses here at the dividing line between two economies — a real-life laboratory for the debate — have found that raising prices to compensate for higher wages does not necessarily lead to losses in jobs and profits. Idaho teenagers cross the state line to work in fast-food restaurants in Washington, where the minimum wage is 54 percent higher. That has forced businesses in Idaho to raise their wages to compete.

"For $7.93 an Hour, It's Worth a Trip Across a State Line," *N.Y. Times* (Jan. 11, 2007).[16]

Similarly, under wage laws like Seattle's that exempt small employers, it is generally recognized that such employers feel pressure to pay the higher wage anyway in order to compete for workers, as the higher wage becomes the going rate expected in the labor market. Thus for example, during the years during 2004-2007 when the Santa Fe minimum wage ordinance

---

[16] Available at: http://www.nytimes.com/2007/01/11/us/11minimum.html?pagewanted=all. Subsequent reporting by the Spokane Spokesman-Review has further documented that far from hurting the Washington State employers that must pay the significantly higher wage, the minimum wage has helped them recruit employees and non-covered employers in Idaho have been forced to raise wages to compete. See Spokesman-Review, "Vestal: For some, a higher wage makes good business sense" (Dec. 8, 2010), available at: http://www.spokesman.com/stories/2010/dec/08/for-some-a-higher-wage-makes-good-business-sense/

exempted small businesses with fewer than 25 employees, the executive director of the Santa Fe Alliance, the city's small business trade association, reported that "many smaller businesses ha[d] been paying the minimum wage to keep good employees." "Santa Fe could delay minimum wage increase but widen coverage," Associated Press (July 13, 2007). This fact led the Santa Fe Alliance to ultimately endorse eliminating the small business exemption altogether. *Id.*

## IV. Higher Wages from Minimum Wage Increases Have Very Significant Beneficial Affects for Low-Income Individuals and Households

The higher incomes that result from minimum wage increases have very direct and tangible impacts on the lives of the workers affected and their families. Currently, wages are falling in real terms for most of the labor force, see National Employment Law Project, "An Unbalanced Recovery" (Aug. 2014),[17] and low-wage workers and families in high cost cities like Seattle are being squeezed between flat pay and rising rents and living costs. Higher city minimum wages have proven an effective strategy for addressing this squeeze by raising pay broadly across the bottom of the city economy. For example, over the decade that San Francisco's minimum wage has been in effect, it has raised pay by more than $1.2 billion for more than 55,000 workers, and has permanently raised citywide pay rates for the bottom 10% of the labor force. Local Minimum Wage Laws, *supra*, at 11-12 (citing Jacobs & Reich, "When Mandates Work," supra). The widely recognized success of San Francisco's minimum wage has led Mayor Ed Lee to place a proposal to follow Seattle's lead and raise the city's minimum wage to $15.00 on the November ballot.

[17] Available at http://www.nelp.org/page/-/Reports/Unbalanced-Recovery-Real-Wage-Job-Growth-Trends-August-2014.pdf?nocdn=1

The higher pay resulting from minimum wage increases translates to a range of other important improvements in the lives of struggling low-paid workers and their households. For workers with the very lowest incomes, studies show that minimum wage increases lift workers and their families out of poverty. See Arindrajit Dube, "Minimum Wages and the Distribution of Family Incomes" (Dec. 2013), at 31 ("… robust evidence that minimum wages tend to reduce the incidence of poverty, and also proportions with incomes under one-half or three-quarters of the poverty line.").[18] Similarly, higher incomes for low-wage workers and their households translate to improved educational attainment, health, and rates of crime and incarceration. For example, a recent study by the National Institutes of Health determined that "[a]n additional $4000 per year for the poorest households increases educational attainment by one year at age 21 and reduces having ever committed a minor crime by 22% at ages 16-17." William Copeland & Elizabeth J. Costello, "Parents' Incomes and Children's Outcomes: A Quasi-Experiment," Am. Econ. J. Appl. Econ. (Jan. 2010), at 1. Another study found that raising California's minimum wage to $13/hr by 2017 "would significantly benefit health and well-being. As a result of the proposed law, about 7.5 million lower-income Californians could expect an increase in family income. Californians would experience fewer chronic diseases and disabilities; less hunger, smoking and obesity; and lower rates of depression and bipolar illness. In the long run, raising the minimum wage would prevent the premature deaths of hundreds of lower-income Californians each year." Rajiv Bhatia, Human Impact Partners, "Health Impacts of Raising California's Minimum Wage" (May 2014), at 1. Yet another study found that high dropout rates among low-income children can be linked to parents' low-wage jobs and that youth in low-

[18] Available at https://dl.dropboxusercontent.com/u/15038936/Dube_MinimumWagesFamilyIncomes.pdf

income families have a greater likelihood of experiencing health problems, including obesity, and they are more likely to bear children at a young age. Lisa Dodson & Randy Albelda, "How Youth Are Put at Risk by Parents' Low-Wage Jobs," Center for Social Policy, Univ. of Mass., Boston, (Fall 2012), at 9-13.

**Conclusion**

For the foregoing reasons, and those presented in the briefs of defendants and of amici Martina Phelps, et al., plaintiffs' motion for a preliminary injunction should be DENIED.

RESPECTFULLY SUBMITTED this 3rd day of October, 2014.

s/ Rebecca Smith
Rebecca Smith, WSBA # 12834
National Employment Law Project
317 17th Ave. S.
Seattle, WA 98144
Tel: (206) 324-4000
Fax: (212) 285-3044
Email: rsmith@nelp.org

Paul K. Sonn, NYS Atty. Reg. # 2644516
National Employment Law Project
75 Maiden Lane, Suite 601
New York, NY 10038
Tel: (212) 285-3025 ext. 351
Fax: (212) 285-3044
Email: psonn@nelp.org

Attorneys for Amicus
National Employment Law Project