HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

INTERNATIONAL FRANCHISE
ASSOCIATION, INC., et al.,

                Plaintiffs,

        v.

CITY OF SEATTLE, et al.,

                Defendants.

CASE NO. C14-848 RAJ

ORDER

## I. INTRODUCTION

On June 3, 2014, the City of Seattle ("the City" or "Seattle"), enacted Ordinance Number 124490 ("the Ordinance"), which establishes a $15 minimum hourly wage. In doing so, Seattle joined dozens of other cities nationwide that have increased the minimum wage beyond both federal and state minimums.[1] The City's stated reason for

---

[1] *See, e.g.*, *City Minimum Wage Laws, Recent Trends and Economic Evidence on Local Minimum Wages*, Nat'l Emp. L. Project, 1 (Dec. 2014), http://www.nelp.org/page/-/rtmw/City-Minimum-Wage-Laws-Recent-Trends-Economic-Evidence.pdf?nocdn=1 (San Jose, $10.15; Santa Fe, $10.66; Washington, DC, $11.50; Oakland $12.25; Chicago, $13.00; San Francisco $15.00).

increasing the minimum wage was to reduce income inequality.  Additionally, the increased minimum wage was intended to "promote the general welfare, health, and prosperity of Seattle by ensuring that workers can better support and care for their families and fully participate in Seattle's civic, cultural and economic life."  Ordinance, WHEREAS clauses 1-12, § 1.

The current minimum wage in Seattle is $9.47.[2]  Although the Ordinance goes into effect on April 1, 2015, the shift to a $15 minimum wage will not happen overnight. There are two phase-in schedules under the Ordinance: a faster phase-in, applicable to large businesses and a slower phase-in, applicable to small businesses.  Large businesses will be required to incrementally raise the minimum wage to $15 in just three years (*i.e.*, reaching $15 by January 1, 2017) whereas small businesses will be allowed seven years (*i.e.*, reaching $15 by January 1, 2021).  Ordinance, § 4.  Small businesses were given this extra time because they lack the same resources as large businesses and will face particular challenges in implementing the law.  Ordinance, § 1, ¶ 9; (Feldstein Decl.) Dkt. # 63, ¶ 10.[3]

Seattle's power to raise the minimum wage to $15 is not at issue in this lawsuit.[4] Indeed, the plaintiffs accept that *eventually* all Seattle employers will be required to pay their employees at least $15.  The issue the court has been asked to address relates solely to how fast this increase will happen for employees of a specific type of business model: franchises (*e.g.*, your local Subways, McDonalds, and Holiday Inns, among many others).

---

[2] Washington State Department of Labor & Industries, Minimum Wage, *available at* http://www.lni.wa.gov/workplacerights/wages/minimum/ (last visited Mar. 16, 2015).

[3] Robert Feldstein is the Director of the Office of Policy and Innovation in the Mayor's Office.

[4] It is well settled that raising the minimum wage is within the City's police power. *See, e.g.*, *RUI One Corp. v. City of Berkeley*, 371 F.3d 1137, 1150 (9th Cir. 2004) (acknowledging that "[t]he power to regulate wages and employment conditions lies clearly within a state's or municipality's police power").

The crux of this lawsuit is the Ordinance's categorization of franchisees as large businesses. Because these businesses are considered large, they will be subject to the faster three-year phase-in schedule. The plaintiffs object to this categorization. Although franchisees are connected to large franchisors, they are technically separate entities under the law. Additionally, individual franchisee outlets often employ only a handful of workers. According to plaintiffs, this makes them more similar to small businesses and equally likely to suffer challenges in implementing the new law. (Compl.) Dkt. # 1, ¶¶ 3, 4; (Pls.' Mot.) Dkt. # 37, p. 18.

Plaintiffs are the International Franchise Association ("IFA"), which is an organization of franchisors, franchisees, and suppliers, and five individual franchisee owners and/or managers. Together, they are seeking a preliminary injunction compelling the City to treat franchisees as "small" businesses rather than "large" businesses. They do not seek to invalidate the entire Ordinance; rather, they ask only that franchisees be subject to the slower (seven year) phase-in schedule applicable to small businesses.

Defendants are the City of Seattle and Fred Podesta, the Director of the Department of Finance and Administrative Service ("the Department"). The Department and its Director are responsible for implementing and enforcing the Ordinance. Defendants will be referred to collectively as "the City" or "Seattle."

For the reasons stated below, the court DENIES plaintiffs' motion for a preliminary injunction.[5]

## II. BACKGROUND

**A. History of the Ordinance**

Shortly after taking office, the Mayor of Seattle assembled an Income Inequality Advisory Committee (the "Advisory Committee"), which consisted of twenty-four

---

[5]The court heard oral argument in this matter on March 10, 2015. Neither party requested an evidentiary hearing.

members, including representatives of business interests and labor unions.  Ordinance, §

1, ¶ 6.  The Mayor formed the Advisory Committee to "address the pressing issue of

income inequality in Seattle" and to seek input regarding a potential increase in the

minimum wage.  Ordinance, § 1, ¶¶ 6, 7; (Feldstein Decl.) Dkt. # 63, ¶ 8.  The Advisory

Committee reviewed scholarly studies on the impact of minimum wage laws in other

cities and hosted numerous public engagement forums, including industry-specific

forums.  Ordinance, § 1, ¶ 8.  In May 2014, the Advisory Committee transmitted its

formal recommendation to the Mayor.  The recommendation advocated for a phased

increase in the minimum wage and acknowledged that small businesses should be subject

to a slower phase-in schedule.  Ordinance, § 1, ¶ 9; (Feldstein Decl.) Dkt. # 63, ¶¶ 10, 11.

The recommendation said nothing specific about the categorization of franchisees.

**B.  The Franchise Business Model**

The term "franchise business model" refers to a long-term business relationship in

which one company (the franchisor) grants other companies (the franchisees) the right to

sell products under its brand, using its business model and intellectual property, generally

in exchange for ongoing royalty payments and other fees.  (Gordon Decl.) Dkt. # 70-2, ¶

6.[6]  Although franchisees are part of the larger organization of the franchisor, they are

legally separate entities.  (Shane Dep.) Dkt. # 81-4, p. 9.[7]  This business model provides

the franchisor with the benefits of vertical control over retail units without the investment

in assets required by full integration.  Mick Carney and Eric Gedajlovic, *Vertical

Integration in Franchise Systems: Agency Theory and Resource Explanations*, 12

Strategic Mgmt. J. 607 (1991).  The employees of a franchisee are not employees of the

franchisor.  (Shane Dep.) Dkt. # 81-4, p. 10.  Franchisees manage the day-to-day aspects

---

[6] John A. Gordon is a franchise business consultant and has provided the court
with an expert declaration in support of the amicus brief of OPEIU Local 8 et al.

[7] Scott A. Shane is an economics professor and has provided the court with an
expert declaration in support of the City's opposition to this motion.

of their business, including making decisions regarding which workers to hire, how many to hire, the benefits they will offer, and how much to pay their employees. *Id.*, p. 19.

Despite this legal separateness, however, franchisees are not free to do as they please. Most franchise agreements heavily regulate the conduct of the franchisee and include statements about how the franchisee is expected to run the franchise, whether or not the franchisee has an exclusive territory, and when and where the franchisee may open another business. (Shane Decl.) Dkt. # 62, ¶ 22. Franchise agreements also contain clauses that outline acceptable outlet "appearance, hours of operation, location, and product quality" and typically allow franchisors to conduct "inspections, audits, mystery shopper programs, and so on" of the franchisees. (Shane Decl.) Dkt. # 62, ¶¶ 22-31.

Franchisees accede to the franchisor's restrictions because being part of a larger network provides significant benefits. Participation in a franchise system often affords brand recognition and customer loyalty, as well as access to, advertising, trade secrets, software, lower material costs, site selection assistance, financing, and extensive operational support and training. (Shane Decl.) Dkt. # 62, ¶ 10. Participation in this system also often affords franchisees more profit than they would earn as individual business owners. (Shane Decl.) Dkt. # 62, ¶ 9. In addition to these factors, franchisors also have the ability to use their greater financial resources to support the franchise by aiding franchisees during time of business stress, including identifying and responding to changed business conditions. (Gordon Decl.) Dkt. # 70-2, ¶ 9.

**C. Mechanics of the Ordinance**

    1. <u>The Two Phase-In Tracks: "Large" and "Small" Businesses</u>

The Ordinance goes into effect on April 1, 2015. The law provides for two core tracks leading to the $15 minimum wage. The first track applies to Schedule One or

"large" businesses (defined as those with 500 or more employees nationwide).[8]  These

businesses will have three years to implement the new law.  Large businesses also have

the opportunity to take advantage of an alternative Schedule One track if they choose to

offer certain health benefits to their employees.  If they offer a qualifying health plan,

they will be given four years to implement the new law.

The second track applies to Schedule Two or "small" businesses (defined as those

with 500 or fewer employees nationwide).[9]  These smaller businesses will have seven

years to implement the new law.  The exact incremental increases for each track are set

forth below:

Schedule One -- large employers (> 500 employees)
- April 1, 2015 -- $11
- January 1, 2016 -- $13
- January 1, 2017 -- $15

Schedule One -- large employers offering health benefits
- April 1, 2015 -- $11
- January 1, 2016 -- $12.50
- January 1, 2017 -- $13.50
- January 1, 2018 -- $15

Schedule Two -- small employers (≤ 500 employees)
- April 1, 2015 -- $10
- January 1, 2016 -- $10.50

---

[8] "'Schedule 1 Employer' means all employers that employ more than 500 employees in the United States, regardless of where those employees are employed in the United States, and all franchisees associated with a franchisor or a network of franchises with franchisees that employ more than 500 employees in aggregate in the United States."  Ordinance § 2.

[9] "'Schedule 2 Employer' means all employers that employ 500 or fewer employees regardless of where those employees are employed in the United States. Schedule 2 employers do not include franchisees associated with a franchisor or network of franchises with franchisees that employ more than 500 employees in aggregate in the United States."  Ordinance, § 2.

- January 1, 2017 -- $11
- January 1, 2018 -- $11.50
- January 1, 2019 -- $12
- January 1, 2020 -- $13.50
- January 1, 2021 -- $15

Ordinance § 4.

By 2021, all employers will be subject to a minimum wage of at least $15 per hour.

### 2. Franchisees and Integrated Enterprises

Under the law, a wholly independent business with more than 500 employees falls into the "large" category and a wholly independent business with 500 or fewer employees falls into the "small" category. Certain types of businesses, however, are not considered independent: franchisees and integrated enterprises.

A franchisee is considered a "large" business if its franchisor and/or its network of franchisees employ more than 500 employees in aggregate in the United States. Ordinance, § 3. This means that the owner of a Subway outlet with only 10 employees will be considered a "large" employer because of his relationship with the Subway franchisor and other Subway franchisees.

Additionally, entities that appear separate but in fact form an "integrated enterprise" are also considered "large" businesses under the Ordinance. Separate entities are considered an "integrated enterprise" if there is a significant degree of: (1) interrelation between the operations of the entities, (2) common management, (3) centralized control over labor relations, and (4) common ownership or financial control over the entities. There is a presumption, however, that separate entities are actually separate employers if: (1) the entities operate substantially in separate physical locations from one another, and (2) each entity has partially different ultimate ownership. Ordinance, § 3. This test applies only to *non*-franchise businesses.

### III. LEGAL STANDARD

Plaintiffs seek a preliminary injunction compelling the City to treat franchisees as small businesses under the new law.  "A preliminary injunction is an extraordinary and drastic remedy; it is never awarded as of right...."  *Munaf v. Geren*, 553 U.S. 674, 689 (2008) (citation and internal quotation marks omitted).  To obtain a preliminary injunction, the moving party must establish that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest.  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

Alternatively, "serious questions going to the merits" and a balance of hardships that tips sharply towards the plaintiffs can support issuance of a preliminary injunction, so long as plaintiffs also show that there is a likelihood of irreparable injury and that the injunction is in the public interest.  *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

### IV. ANALYSIS

Plaintiffs allege a number of claims against the City, including: (1) violation of the Commerce Clause, (2) violation of the Equal Protection Clause, (3) violation of the First Amendment, (4) Lanham Act preemption, (5) ERISA preemption, and (6) violation of the Privileges and Immunities Clause of the Washington State Constitution.  The court will address the merits of each claim below.

**A. The Dormant Commerce Clause**

The Constitution was framed upon the theory that "the peoples of the several states must sink or swim together, and that in the long run prosperity and salvation are in union and not division."  *Baldwin v. G.A.F. Seeling, Inc.*, 294 U.S. 511, 523 (1935).  Thus, the Court "has consistently held that the Constitution's express grant to Congress of the power to 'regulate Commerce … among the several States,' Art. I, § 8, cl.3,

1  contains, 'a further, negative command, known as the dormant Commerce Clause ….' "

2  *Am. Trucking Ass'n, Inc. v. Michigan Public Service Comm'n*, 545 U.S. 429, 433 (2005)

3  (quoting *Okla. Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 174 (1995)).

4        The dormant Commerce Clause bars state and local governments from erecting

5  taxes, tariffs, or regulations that favor local businesses at the expense of interstate

6  commerce. *Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 35 (1980).  One of its core

7  purposes is to prevent states from engaging in economic protectionism -- *i.e.*, shielding

8  local markets from interstate competition. *Dep't of Revenue of Ky. v. Davis*, 553 U.S.

9  328, 337-38 (2008) (citing *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269 (1988)).

10        The dormant Commerce Clause's two-tiered analytical framework is well settled:

11  (1) the anti-discrimination test -- which involves heightened scrutiny and (2) the *Pike*

12  balancing test -- a lower bar.  The anti-discrimination test involves a two-step inquiry.

13  The first step is to ask whether the statute discriminates facially, has a discriminatory

14  purpose, or has a discriminatory effect against interstate commerce. *Nat'l Ass'n of*

15  *Optometrists & Opticians LensCrafters, Inc. v. Brown*, 567 F.3d 521, 525 (9th Cir. 2009).

16  If it does, at the second step, the burden shifts to the state to justify that discrimination by

17  showing the discrimination is necessary to achieve a legitimate local purpose and that

18  there is no reasonable non-discriminatory means for accomplishing the same objective.

19  *See, e.g.*, *Maine v. Taylor*, 477 U.S. 131, 138 (1986).

20        A determination that the law is non-discriminatory under the first tier, however,

21  does not end the analysis.  The court must move on to the second tier and apply the *Pike*

22  balancing test when the non-discriminatory law nevertheless has some burden on

23  interstate commerce. *Nat'l Ass'n of Optometrists*, 567 F.3d at 528.  Under *Pike*, the law

24  will only be invalidated if plaintiffs can show that the burden on interstate commerce is

25

26

27

1   clearly excessive in relation to the putative local benefits.[10]  *Pike v. Bruce Church, Inc.*,

2   397 U.S. 137, 142 (1970).

3       1. <u>Tier One: The Anti-Discrimination Test</u>

4           *a.  Does the Ordinance discriminate on its face?*

5   To determine which wage schedule applies, the Ordinance counts all employees of

6   a particular employer nationwide without regard to geographic location.  Indeed, the

7   Ordinance's faster phase-in schedule applies to franchises with headquarters here in

8   Washington.  Accordingly, the language of the Ordinance does not facially discriminate

9   against out-of-state entities.

10          *b.  Does the Ordinance have a discriminatory purpose?*

11  Discriminatory purpose exists when a state or local statute is "motivated by an

12  intent to discriminate against interstate commerce."  *Family Winemakers of Cal. v.*

13  *Jenkins*, 592 F.3d 1, 13 (1st Cir. 2010).  The words of the legislative body itself, written

14  contemporaneously with the passage of the law in question, are the most persuasive

15  source of legislative purpose.  *See, e.g.*, *Minnesota v. Clover Leaf Creamery Co.*, 449

16  U.S. 456, 463 n. 7 (1981) ("[T]his Court will assume that the objectives articulated by the

17  legislature are actual purposes of the statute, unless examination of the circumstances

18  forces us to conclude that they 'could not have been a goal of the legislation.'").  The

19

20      [10] The court notes that the decisions interpreting the dormant Commerce Clause
21  appear somewhat difficult to reconcile.  *See*, *W. Lynn Creamery, Inc. v. Healy*, 512 U.S.
    186, 210 (1994) (Scalia, J., concurring) ("[O]nce one gets beyond facial discrimination
22  our negative-Commerce-Clause jurisprudence becomes (and long has been) a
    quagmire.") (internal quotation marks omitted); *see also* Brannon P. Denning,
23  *Reconstructing the Dormant Commerce Clause Doctrine*, 50 Wm. &Mary L. Rev. 417,
    423 (2008) (noting that "a number of the Court's [ ] cases are, in fact, impossible to
24  reconcile….").  Nevertheless, the Court has attempted to apply the framework to serve
    the purpose of the dormant Commerce Clause --*i.e.*, to prevent barriers to the flow of
25  interstate commerce -- while keeping in mind the "residuum of power" in a municipality
26  to make laws governing matters of local concern.  *S. Pac. Co. v. State of Ariz.*, 325 U.S.
    761, 767 (1945).
27

legislature's stated purpose, however, is not dispositive.  Several additional factors have been recognized as probative of discriminatory intent: (1) evidence of a consistent pattern of actions by the decision-making body disparately impacting members of a particular class of persons; (2) historical background of the decision, which may take into account any history of discrimination by the decision-making body or the jurisdiction it represents; (3) the specific sequence of events leading up to the particular decision being challenged, including any significant departures from normal procedures; and (4) contemporary statements by decision-makers on the record or in minutes of their meetings.  *See, e.g.*, *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267-68 (1977); *Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 336 (4th Cir. 2001).

Here, the stated legislative purposes for increasing the minimum wage included reducing income inequality and promoting the general welfare, health, and prosperity of Seattle by allowing low-wage workers to better support themselves and to participate in the City's civic and economic activities.  Ordinance, WHEREAS clauses 1-12, § 1.  The rationale for differentiating between large and small businesses was the recognition that "some employers, in particular small businesses and not-for-profit organizations, may have difficulty in accommodating the increased costs."  Ordinance, § 1, ¶ 9.

Plaintiffs do not contend that the City has engaged in a consistent pattern of actions disparately impacting out-of-state franchises, nor do they contend that the City has a history of discriminating against out-of-state franchises.  Rather, to show discriminatory purpose, they point only to comments from one member of the Advisory Committee and isolated statements made by three lawmakers.[11]

---

[11] In the entirety of the legislative history, plaintiffs object to a total of five emails and five public statements.  (Exs. to Groesbeck Decl. iso Pls.' Mot.) Dkt. ## 38-2, 38-3, 38-10, 38-11, 38-12, 38-15, 38-16, 38-17, 81-1, and 81-2.  The court reviewed and

Plaintiffs focus mainly on the comments of Nick Hanauer, a private citizen on the Mayor's Advisory Committee.  Mr. Hanauer made statements in email correspondence to other members of the committee and to the City Council, such as:

> [F]ranchises like subway and McDonalds really are not very good for our local economy…A city dominated by independent, locally owned, unique sandwich and hamburger restaurants will be more economically, civically and culturally rich than one dominated by extractive national chains.

Dkt. # 38-2, p. 2.

He also stated:

> …[F]ranchises dominate their niches, not because they are intrinsically better, but mostly because they benefit massively from the scale of their parent operations. Cheaper ingredients. Cheaper equipment. Better lease terms. Better training. Better and more advertising. Well known brand. etc, etc, etc.…I have nothing against these companies.  They have a right to operate.  But our city has no obligation to continue policies that so obviously advantage them and disadvantage the local businesses that benefit our city and it's [*sic*] citizens more.

Dkt. # 38-10, p. 2.

In response to one of Mr. Hanauer's emails, Robert Feldstein, a member of the Mayor's staff, wrote in an email:

> I like the thinking but would love some additional thinking to help think through how to answer concerns about the effect on the individual immigrant business owner who decided to open a Subway rather than a bahn mi shop.  I will admit upfront that I probably know least about [the] franchise model so there might be big gaps that I don't understand.  That's part of why I'm asking for help in thinking this through.…If

---

considered all of the emails and statements identified by the parties, despite not including a verbatim recitation of each in its opinion.

> we lose franchises in Seattle, I won't be sad – for the reasons
> you say.  But are their ways for the cost to be born not on
> those franchise owners? Are they simply going to be a
> casualty of this transition? Are they less sympathetic or less at
> financial risk than I am imagining….

Dkt. # 38-3, p. 2.[12]

Additionally, two City Council members made comments regarding the resources

flowing to franchisees from their "large" and/or "corporate" franchisors.  Councilmember

Kshama Sawant stated at a public hearing that:

> It's important, before we get lost in to this false idea that
> franchisees are somehow struggling businesses, we should
> look at the evidence here, which compiles McDonald's,
> Burger King, and Wendy's owners in Seattle…Just six
> companies own every franchised big burger chain in Seattle,
> and those six companies own a total of 236 locations all
> across the country.  These are not small businesses.  And a
> McDonald's franchise requirement is $750,000 of personal
> wealth, not borrowed money, and [a] $45,000 franchisee fee,
> 40% of the total cost to open a new restaurant must be paid in
> cash.  Now yes, it's true that the McDonalds headquarters,
> corporate headquarters, takes away the lion's share of the
> profits, but in order to be a franchisee, you have to be very,
> very wealthy.  Just a small business person of color from
> Rainier Beach is not going to be able to afford to open a
> franchise outlet.

Dkt. # 38-11, p. 4; *see also* Dkt. # 38-12, p. 2 (writing on her official website, she also

stated, "It's clear that the current franchise model is rigged against workers."); Dkt. # 38-

15, p. 2 (tweeting from her official twitter account, she also stated, "Franchise owners:

enough with the blame game! Organize, go to CorpHQ & renegotiate your rents.").

---

[12] It is unclear whether Mr. Feldstein actually sent this response to Mr. Hanauer. Defendants claim it was merely a draft, but Mr. Feldstein's declaration does not confirm this allegation.  (Defs.' Opp.) Dkt. # 61, n. 4; (Feldstein Decl.) Dkt. # 63.  The court, nevertheless, considered the email as if it was sent.

1    Similarly, Councilmember Mike O'Brien stated the following in response to a

2    constituent's email objecting to the categorization of franchisees as "large" businesses:

3           I know a lot of franchise owners are struggling to survive
4           under current minimum wage rules and I have met with a
             number of them and am sympathetic to their situation.  That
5           said, their workers are also struggling to survive at the current
             minimum wages too.  The ones not struggling are the
6           corporate parents of all these, and we don't have a direct path
             to the parent corporations to make them treat both the
7           employees and the franchise owners fairly.  My hope is that
8           the path we have chosen will force parent companies to treat
             franchise owners fairly and allow employees at these
9           businesses to make closer to a living wage.  I don't believe
10          that the large parent companies of these franchises will allow
             their businesses in Seattle to fail and give up the market to the
11          competition and I expect over time adjustments will need to
12          be made to accommodate the new minimum wage….Because
             workers at fast food franchises make up a large portion of
13          people in Seattle currently earning minimum wage, this felt
             like an appropriate trade off.
14
15   Dkt. # 81-2, p. 2.

16          Finally, after the Ordinance was enacted, the Mayor issued the following

17   statement in a press release:

18          Franchises have resources that a small business in the Rainier
             Valley or a small sandwich shop on Capitol Hill do not have.
19          Franchise restaurants have menus that are developed by a
20          corporate national entity, a food supply and products that are
             provided by a corporate national entity, training provided by a
21          corporate national entity, and advertising provided by a
             corporate national entity. They are not the same as a local
22          sandwich shop that opens up or a new local restaurant that
23          opens up in the city. Our process for reaching $15 an hour in
             Seattle recognizes that difference.
24
25   Dkt. # 38-16, p. 2.

26          The court finds that these statements are insufficient to show that the law was

27   enacted for a discriminatory purpose.

ORDER- 14

First, the court gives little weight to the comments of an Advisory Committee member.  Mr. Hanauer had no part in drafting the Ordinance and, unlike a lawmaker, he had no responsibility to consider and weigh opposing viewpoints.  Because he was not the ultimate decision-maker, Mr. Hanauer was free to zealously lobby for and advance his own line of thinking on this issue. [13]  The same is true for other private citizens who, in fact, disagreed with Mr. Hanauer and voiced pro-franchise views.  For example, David Meinert, another Advisory Committee member, stated in an email to the Mayor's staff: "From breaking franchise agreements to outside 'education' of workers funded by the city, to getting rid of tips to lack of training wage.  I have to speak out against these things." Dkt. # 38-4, p. 2.  MSA Worldwide, a franchise advisory firm, also wrote a detailed letter to the Mayor arguing that "[b]y its actions, the City of Seattle is statutorily denying franchisees the right to exist in Seattle...." Dkt. # 38-8, p. 2.  Additionally, The Seattle Times wrote an editorial criticizing the categorization of franchisees as "large" businesses.  *See*, *Editorial: Redefine franchises under Seattle's minimum-wage proposal*, The Seattle Times, May 30, 2014 ("[The Ordinance] effectively discriminates against a business model – franchises – by giving non-franchisees a slower phase-in.").  If the court were to extend its inquiry into every statement made by every Advisory Committee member or other private person on an issue as politically charged as this one, it would surely discover a plethora of advocacy by both sides -- e.g., statements at public hearings, editorials, and letters to lawmakers -- some of which might well be discriminatory.

Second, the statements made by lawmakers do not expressly suggest an intent to discriminate against out-of-state interests.  While they refer to the franchisor as the

---

[13] The court has reviewed an email sent by Councilmember Tim Burgess to Mr. Hanauer thanking him for his "leadership on this important issue."  Dkt. # 81-1.  This email, when read in context, appears to be a simple acknowledgement of Mr. Hanauer's efforts to advance one line of thinking on the minimum wage ordinance.  There is no evidence that Councilmember Burgess or any other Councilmember adopted any of Mr. Hanauer's opinions as their own.

"corporate headquarters," the "corporate national entity" and the "parent corporation," the statements, when considered in context, are reasonably read to distinguish between entities with more resources and those with fewer resources.  Indeed, each of the statements refers to the resources of franchisees and their ability to adjust to the increased minimum wage on an accelerated basis.  Councilmember Sawant stated, "[W]e [should not] get lost into this false idea that franchisees are somehow struggling businesses…. These are not small businesses…."  Councilmember O'Brien stated, "The ones not struggling are the corporate parents of all these, and…I expect over time adjustments will need to be made to accommodate the new minimum wage."  Finally, the Mayor stated, "Franchises have resources that a small business in the Rainier Valley or a small sandwich shop on Capitol Hill do not have…They are not the same as a local sandwich shop that opens up or a new local restaurant that opens up in the city."  Whether accurate or not, the statements made by these lawmakers are consistent with the Ordinance's stated purpose of differentiating between large and small businesses -- businesses with more resources can more easily (and more quickly) adjust to the increasing minimum wage, while small businesses, with fewer resources, may have difficulty in accommodating the costs.

Third, the court notes that the Ordinance passed by unanimous vote and plaintiffs have identified no objectionable comments made by any other City Council members.  Thus, even if the aforementioned statements could somehow be construed to indicate some impermissible motivation, isolated and stray comments by two Council members are insufficient to override the entire City Council's formal statements of purpose in the Ordinance itself.  *Compare Allstate Ins. Co. v. Abbott*, 495 F.3d 151, 161 (5th Cir. 2007) (finding stray protectionist remarks of certain legislators were insufficient to condemn statute under the dormant Commerce Clause where overall legislative record revealed legitimate, nondiscriminatory purposes), *with Waste Mgmt. Holdings, Inc.*, 252 F.3d at 336-40 (finding discriminatory purpose when comments of lawmakers expressly referred

to imposing burdens and restrictions on actors "outside" the state and sequence of events leading up to enactment of statute clearly established impermissible motive), *and Family Winemakers*, 592 F.3d at 7, 15-17 (finding discriminatory purpose when protectionist statements by lawmakers caused the state legislature to amend a statute to include a unique exception that would favor a particular in-state winery).

Fourth, and finally, the record does not reveal any significant departures from normal procedures in enacting the Ordinance. It is no secret that the minimum wage increase was hotly debated and that interest groups from both sides weighed in on the issue. These included both labor interests and franchise interests and both represented Seattle voters. (Exs. to Groesbeck Decl. iso Pls.' Mot.) Dkt. ## 38-1 to 38-17; (Exs. to Grosebeck Decl. iso of Pls.' Reply) Dkt. ## 81-1 to 81-3. Thus, the alleged statements by some union leaders, for example, indicating a desire to "break the franchise model" do not surprise the court. (Meinert Decl.) Dkt. # 37-2, ¶ 4. Even if true, such fervent remarks and lobbying efforts by interest groups cannot be imputed to the City Council. *See*, *W. Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 215 (1994) (Rehnquist, C.J., dissenting) ("Analysis of interest group participation in the political process may serve many useful purposes, but serving as a basis for interpreting the dormant Commerce Clause is not one of them."). The City Council likely heard many opposing viewpoints leading up to the enactment of the Ordinance. In response, the lawmakers asked questions (for example, Mr. Feldstein requested additional information, stating "I will admit upfront that I probably know least about [the] franchise model so there might be big gaps that I don't understand…Are [franchisees] less sympathetic or less at financial risk than I am imagining?") and inquired into the financial risks facing franchisees and their potential resources. The findings by the Mayor and other lawmakers regarding the benefits flowing to these entities from their franchisors support the conclusion that

1   franchisees were categorized as "large" employers based upon a determination that they

2   could handle the faster phase-in schedule, not by any protectionist motive.[14]

3     Accordingly, the court does not find that the categorization of franchisees as large

4   businesses was motivated by a desire to discriminate against interstate commerce.

5        *c. Does the Ordinance have a discriminatory effect?*

6     To prove discriminatory effect, plaintiffs have the burden of producing substantial

7   evidence showing that the law discriminates in practice. *Black Star Farms LLC v. Oliver*,

8   600 F.3d 1225, 1232 (9th Cir. 2010); *Family Winemakers*, 592 F.3d at 11.

9   Discrimination means "differential treatment of in-state and out-of-state economic

10  interests that benefits the former and burdens the latter." *Or. Waste Sys., Inc. v. Dep't of*

11  *Envtl. Quality*, 511 U.S. 93, 99 (1994). Of course, the "differential treatment" must be as

12  between entities that are similarly situated. *See Gen. Motors Corp. v. Tracy*, 519 U.S.

13  278, 298-99 (1997); *Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc. v.*

14  *Brown*, 567 F.3d 521, 527 (9th Cir. 2009).

15    Although the dormant Commerce Clause protects against burdens on interstate

16  commerce, it also respects federalism by protecting local autonomy. *Nat'l Ass'n of*

17  *Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1148 (9th Cir. 2012) (citing *Dep't of*

18  *Revenue v. Davis*, 553 U.S. 328, 338 (2008)). The Supreme Court has recognized that

19  "under our constitutional scheme the States retain broad power to legislate protection for

20  their citizens in matters of local concern" and has held that "not every exercise of local

21

---

22    [14] Additionally, even if the court were to find that the law was motivated by some
23  discriminatory purpose, that finding alone would be unlikely to violate the Commerce
    Clause. *Alliance of Auto. Mfrs. v. Gwadosky,* 430 F.3d 30, 36 (1st Cir. 2005) (noting
24  "[t]here is some reason to question whether a showing of discriminatory purpose alone
    will invariably suffice to support a finding of constitutional invalidity under the dormant
25  Commerce Clause"); *see also* Kathleen M. Sullivan & Gerald Gunther, Constitutional
    Law 275 (15th ed. 2004) (recognizing the analytical difficulty that arises because "a law
26  motivated wholly by protectionist intent might fail to produce significant discriminatory
27  effects").

power is invalid merely because it affects in some way the flow of commerce between the States." *Id.* (quoting *Great Atl. & Pac. Tea Co. v. Cottrell*, 424 U.S. 366, 371 (1976)); *see also Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1148 (9th Cir. 2012) ("A critical requirement for proving a violation of the Commerce Clause is that there must be a *substantial burden* on *interstate commerce*.") (emphasis in original).

Thus, it is plaintiffs' burden to show that the law causes local goods to constitute a larger share and goods with an out-of-state source to constitute a smaller share of the market. *See Black Star Farms*, 600 F.3d at 1232-33; *see also Cherry Hill Vineyard, LLC v. Baldacci*, 505 F.3d 28, 36 (1st Cir. 2007) (plaintiff claiming discriminatory effect must submit "probative evidence of adverse impact" and where a statutory provision "is evenhanded on its face and wholesome in its purpose," a "substantial" evidentiary showing is required to prove discriminatory effect); *Nat'l Paint & Coatings Ass'n v. City of Chicago*, 45 F.3d 1124, 1132 (7th Cir. 1995) (discriminatory effect was not established where "plaintiffs did not offer any evidence").  Potential or possible discrimination is not sufficient, and the court is not permitted to speculate or to infer discriminatory effect without substantial proof. *Black Star Farms*, 600 F.3d at 1232, 1235.  As the Ninth Circuit has stated, "[P]rove it, or lose it." *Id.* at 1232.

Here, plaintiffs claim that the Ordinance disproportionately impacts out-of-state franchisors.  623 franchises operate in Seattle; 600 (or 96.3%) of those have out-of-state franchisors.  (Reynolds Decl.) Dkt. # 37-4, ¶ 17.[15]  Additionally, all of the 23 in-state franchisors are associated with franchisees outside of the state of Washington. *Id.*  Thus, plaintiffs argue, the Ordinance overwhelmingly burdens out-of-state entities.  Plaintiffs

---

[15] John R. Reynolds is the President of the IFA Educational Foundation and has provided the court with a declaration in support of plaintiffs' motion.

also claim that the Ordinance will put franchisees at a competitive disadvantage as compared to other similarly situated small businesses by increasing their labor costs.

As an initial matter, comparing franchisees and independent small businesses is somewhat difficult; they are not "similarly situated" in all relevant respects.  It is true that they compete in the same markets and it is also true that a franchisee who owns only one outlet may share some similarities with an independent small business.  That said, franchisees and independent small businesses have different business structures.  *See Nat'l Ass'n of Optometrists & Opticians Lenscrafters, Inc. v. Brown*, 567 F.3d 521, 527 (9th Cir. 2009) ("Because states may legitimately distinguish between business structures in a retail market, a business entity's structure is a material characteristic for determining if entities are similarly situated.").  The franchisee has, through his contract with the franchisor, made a business decision -- *i.e.*, to pay royalties and fees in exchange for use of a brand name, training, advertising, established customer base, and other benefits -- presumably because he deemed this arrangement profitable.  The City, however, has had no part in creating or defining this structure and has no duty to promote it or protect it.  Increasing costs for a particular type of business model, even one that involves interstate commerce, does not violate the dormant Commerce Clause without a further showing of impact on the flow of goods among the states.  The Commerce Clause simply does not protect "the particular structure or methods of operation in a retail market." *Exxon Corp. v. Governor of Md.*, 437 U.S. 117, 127 (1978).  Nor does it "give an interstate business the right to conduct its business in what it considers the most efficient manner," for "the Constitution protects the interstate market, not particular interstate firms, from prohibitive or burdensome regulations." *Valley Bank of Nev. v. Plus Sys., Inc.*, 914 F.2d 1186, 1993 (9th Cir. 1990) (citing *Exxon*, 437 U.S. at 127-28).

Second, even if the court were to find that franchisees are similarly situated to independent small businesses, plaintiffs have not produced substantial evidence showing discriminatory effect. *Black Star Farms*, 600 F.3d at 1232.  Pointing to a 96.3%

connection to out-of-state entities is insufficient.  *See, e.g.*, *Exxon*, 437 U.S. at 125-29

(finding that even when the burden of legislation falls 100% on out-of-state entities, that

fact alone "does not lead, either logically or as a practical matter, to a conclusion that the

State is discriminating against interstate commerce in the retail market"); *Valley Bank*,

914 F.2d at 1193 ("[E]ven a disproportionate effect on out-of-state residents…does not

necessarily violate the commerce clause.").  Instead, plaintiffs must show that the faster

phase-in schedule will cause local goods to constitute a larger share and goods with an

out-of-state source to constitute a smaller share of the market.  *Black Star Farms*, 600

F.3d at 1233.  While plaintiffs argue that this will necessarily occur, they have not

presented evidence of an actual, rather than potential, impact on interstate commerce.

Identifying a correlation between franchisees and out-of-state business entities, even a

very strong correlation, does not establish the further fact that a burden on franchisees in

Seattle will cause a reduction in the flow of commerce across state lines.

Plaintiffs' cases are not to the contrary.  For example, in *Cachia v. Islamorada*,

542 F.3d 839 (11th Cir. 2008), the court considered an ordinance which stated that

"[f]ormula restaurants shall not be permitted in any zoning district of [Islamorada]."  542

F.3d at 841.  The court found that the ordinance had a discriminatory effect because it

served as "an <u>explicit barrier</u> to the presence of national chain restaurants, thus <u>preventing</u>

<u>the entry</u> of such businesses into competition with independent local restaurants."  *Id.* at

842 (emphasis added).  Thus, the *Cachia* ordinance expressly banned formula restaurants

and erected a figurative wall around the local market.

In *Island Silver & Spice, Inc. v. Islamorada*, 542 F.3d 844 (11th Cir. 2008),

another case relied upon by the plaintiffs, the court considered an ordinance that limited

formula retail establishments (*e.g.*, Target or Walmart) to 2,000 square feet of retail space

and 50 feet of frontage.  542 F.3d at 846.  The parties had stipulated that this restriction

"effectively prevents the establishment of new retail stores," and "a facility limited to no

more than 2,000 square feet or 50' of frontage can not accommodate the minimum

requirements of nationally and regionally branded formula retail stores." *Id.* The court

acknowledged that even when the burden of a regulation falls onto a subset of out-of-

state retailers, that fact "does not, by itself, establish a claim of discrimination against

interstate commerce." *Id.* (quoting *Exxon*, 437 U.S. at 126). The court found, however,

that the ordinance's effective elimination of all new interstate retailers had the "practical

effect of…discriminating against" interstate commerce. *Id.* at 847 (emphasis added).

Thus, the playing field was rigged so sharply against interstate retailers, it effectively

eliminated them from the city -- a clear move toward economic isolation.

Similarly, in *Hunt v. Washington State Apple Advertising Commission*, 432 U.S.

333 (1977), the Supreme Court found that a North Carolina produce labeling statute had

"a leveling effect which insidiously operate[d] to the advantage of local apple producers."

432 U.S. at 351. North Carolina had enacted a statute which required all closed

containers of apples shipped into the state to bear "no grade other than the applicable

U.S. grade or standard." *Id.* at 335. This meant that any individual state's grading

system could not be used on apple containers shipped into North Carolina. *Id.* At the

time, Washington State was the nation's largest producer of apples, its crops accounting

for approximately 30% of apples grown domestically and nearly 50% of all apples

shipped in closed containers in interstate commerce. *Id.* at 336. Washington had its own

grading system, which reflected a stringent inspection program that required compliance

with quality standards that were the equivalent of or superior to the standards adopted by

the United States Department of Agriculture. *Id.* Washington's system had become the

industry standard and Washington apple containers were, of course, labeled with

Washington grades. *Id.* at 351. North Carolina, by contrast, had never established a

grading or inspection system. Thus, the North Carolina law, which prohibited the use of

state grades, had no impact on North Carolina apple growers. The burden fell entirely on

out-of-state entities. *Id.* But that fact alone was not enough to lead the Court to conclude

that the law discriminated against interstate commerce. *Id.*; s*ee also Exxon*, 437 U.S. at 125-29.

In *Hunt*, the plaintiff presented *evidence* that out-of-state apple growers had incurred substantial costs in complying with the law and had in fact lost accounts as a direct result of the statute. *Hunt*, 432 U.S. at 347. Indeed, the statute had raised the costs of doing business in North Carolina to the point where Washington apple growers were faced with abandoning the North Carolina market. *Id.* at 340. North Carolina apple growers, by contrast, suffered absolutely no negative impacts under the law. Thus, based upon this evidence, the Court found that North Carolina had "insidiously" rigged the playing field in a way that would cause local goods to constitute a larger share of the market. *Id.* at 351; *see also Black Star Farms*, 600 F.3d 1232 (distinguishing *Hunt*).

Here, unlike *Cachia*, plaintiffs have not shown that the Ordinance creates any barrier to the entry of franchisees into the Seattle market; unlike *Island Silver & Spice*, they have not shown that the Ordinance will effectively eliminate franchisees from the Seattle market; and unlike *Hunt*, they have not shown that the playing field has been rigged in a such way that local goods are certain, or virtually certain, to constitute a larger share of the market. The evidence of market impact in this case simply does not rise to the level of that presented in cases where a law has been found to violate the dormant Commerce Clause.

Although plaintiffs contend that by increasing franchisees' labor costs, the City is "rigging the playing field," akin to *Hunt* or the *Islamorada* cases, to prevail on their dormant Commerce Clause challenge, plaintiffs must present evidence that the City has done so in a way that will impact the flow of interstate commerce. *See, e.g.*, *Hunt*, 432 U.S. at 349 ("Not every exercise of state authority imposing some burden on the free flow of commerce is invalid."); *Milk Control Bd. v. Eisenberg Farm Prod.*, 306 U.S. 346, 351-52 (1939) ("Every state police statute necessarily will affect interstate commerce in some degree, but such a statute does not run counter to the grant of Congressional power

merely because it incidentally or indirectly involves or burdens interstate commerce….");

*cf. Family Winemakers*, 592 F.3d at 11 ("Here, the totality of the evidence introduced by the plaintiffs demonstrates that the… [statute's] effect is to significantly alter the terms of competition between in-state and out-of-state wineries to the detriment of the out-of-state wineries that produce 98 percent of the country's wine.").

Again, the evidence of discriminatory effect must be substantial. *See Black Star Farms*, 600 F.3d at 1233 (distinguishing *Family Winemakers* on this very point and finding that the "plaintiffs in that case, unlike the plaintiffs here, had *evidence* to prove their contentions") (emphases added). Here, there is simply no credible evidence in the record that indicates franchisees will close up shop or reduce operations, or that new franchisees will not open up in Seattle. Although one plaintiff's declaration indicates that the faster phase-in *may* cause her to go out of business, she is only speculating. (Lyons Decl.) Dkt. # 37-5, ¶ 20.[16] Her declaration is merely anecdotal and does not include any data analysis or empirical evidence that would lead the court to believe that imposing a faster phase-in schedule on franchisees is going to impact interstate commerce. The same is true regarding the survey results presented by *amici curiae*, in which a minority of small business owners *predicted* that they were "likely" to limit expansion in response to the wage increase. (Br. of Am. Hotel & Lodging Ass'n et al.) Dkt. #43-1, p. 8. The survey is based upon little more than conjecture and, in any case, fails to differentiate the responses of independent small business owners from those of franchisees.[17] Further, other *amici* have submitted contrary evidence, showing that although business owners in

---

[16] Katherine M. Lyons is an individual plaintiff in this matter and the owner of a BrightStar Care franchise.

[17] *New Survey of Seattle Businesses: $15 Wage Hike Will Raise Prices, Reduce Job Opportunities, and Shut Doors*, Emp. Policies Inst. (June 24, 2014), *available at* http://www.epionline.org/release/new-survey-of-seattle-businesses-15-wage-hike-will-raise-prices-reduce-job-opportunities-and-shut-doors/.

1  San Jose made similar predictions in response to that City's minimum wage increase,

2  "[f]ast-food hiring accelerated once the higher wage was in place."[18]  (Br. of. Nat'l Emp.

3  Law Project) Dkt. # 76, p. 15.  Indeed, as stated recently by the CEO of Togo's Eateries,

4  a sandwich franchisor that is planning an expansion into Seattle, "[the increase in the

5  minimum wage] is what it is.  Every city passes its own laws.  We have a way to adjust

6  the pricing and labor models to help us still be competitive but also make a profit."

7  Rachel Lerman, *Fast-food eatery Togo's will expand to Seattle (not afraid of $15 wage)*,

8  Puget Sound Bus. J. (June 11, 2014).  Mr. Gordon, one of the franchise experts,

9  confirmed this possibility, stating, "[F]ranchisors also have the ability to use their greater

10  financial resources to support the franchise by aiding franchisees during time of business

11  stress.  Because of these advantages, franchisees and franchisors are better able than

12  independent small businesses to identify and respond to changed business conditions,

13  including regularly scheduled minimum wage increases."  (Gordon Decl.) Dkt. # 70-2,

14  ¶9.

15      Put simply, there is no evidence demonstrating whether the Ordinance will have

16  an impact on interstate commerce one way or the other, and the court declines to infer

17  that it will necessarily have a negative one.  At most, plaintiffs have shown *possible* or

18  *potential* discriminatory effect, and as the Ninth Circuit has already found, that showing

19  is insufficient.  *See Black Star Farms*, 600 F.3d at 1232, 1235 ("Courts examining a

20  'practical effect' challenge must be reluctant to invalidate a state statutory

21  scheme…simply because it *might* turn out down the road to be at odds with our

22

23  _____

    [18] S*ee, e.g.*, Eric Morath, *What Happened to Fast-Food Workers When San Jose*

24  *Raised the Minimum Wage? Hold the Layoffs*, Wall Street Journal, April 9, 2014;

    Timothy Egan, *For $7.93 an hour, It's Worth a Trip Across a State Line*, N.Y Times, Jan.

25  11, 2007 (finding that when Washington State raised its minimum wage, businesses near

26  the Idaho state line "prospered far beyond their expectations" and suffered no decrease in

    profitability).

27

constitutional prohibition against state laws that discriminate against interstate commerce.").

2.  Tier Two: The *Pike* Balancing Test

Because the court finds no discriminatory purpose or effect, it must move on to the *Pike* balancing test.  Under that test, despite being non-discriminatory, a statute or regulation may be invalid if it, nevertheless, has an indirect effect on interstate commerce:

> When...a statute has only indirect effects on interstate commerce and regulates evenhandedly, we have examined whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits.

*Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).  Under *Pike*, if a legitimate local purpose is found, then the question becomes one of degree.  The extent of the burden that will be tolerated depends on the nature of the local interest involved.  *Id.*

Even in weighing competing interests, however, "the Supreme Court has frequently admonished that courts should not second-guess the empirical judgments of lawmakers concerning the utility of legislation." *S.D. Myers, Inc . v. City of San Francisco*, 253 F.3d 461, 471 (9th Cir. 2001) (quoting *Pac. Nw. Venison Prods. v. Smitch*, 20 F.3d 1008, 1017 (9th Cir. 1994)).  Instead, for a facially neutral statute to violate the Commerce Clause, the burdens of the statute must so outweigh the putative benefits as to make the statute unreasonable or irrational.  *Id.* (quoting *Ala. Airlines, Inc. v. City of Long Beach*, 951 F.2d 977 (9th Cir. 1991)).  A challenge to the legislative judgment must establish that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decision-maker. *Spoklie v. Montana*, 411 F.3d 1051, 1059 (9th Cir. 2005) (quoting *Minnesota v. Clover Leaf Creamery, Co.*, 449 U.S. 456 (1981)).

Here, even if the court assumes that the Ordinance will have some incidental

burden on interstate commerce, for the reasons articulated above, plaintiffs have not shown that burden will "clearly exceed" the proffered local benefit, such that the benefit is unreasonable or irrational.  The Ordinance is, at least putatively, designed to assist low wage workers, to decrease the gender wage gap, and to ensure that workers can better support and care for their families and fully participate in Seattle's civic, cultural and economic life -- objectives that are well within the scope of legitimate municipal policymaking.  While the court may philosophize about ways that the Ordinance could have been more narrowly tailored to achieve these goals, it is not the court's place to second guess the reasoned judgments of the lawmakers who studied and analyzed this issue as part of an involved legislative process.  Ordinance § 1, ¶¶ 5-9.  Accordingly, the court finds that the Ordinance survives the *Pike* balancing test as well.

**B. Equal Protection**

Plaintiffs also contend that the Ordinance arbitrarily and irrationally discriminates against franchisees because it treats franchisees employing only 5-10 workers as "large" employers and subjects them to the faster phase-in schedule.  This results, they argue, in a disadvantage to franchisees because they compete with small independent businesses that will not be subject to the same labor costs during the phase-in of the minimum wage. (Pls.' Mot.) Dkt. # 37, pp. 22-25.

Whether embodied in the Fourteenth Amendment or inferred from the Fifth, equal protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices.  *F.C.C. v. Beach Commcn's, Inc.*, 508 U.S. 307, 313 (1993).  "In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against an equal protection challenge if there is *any reasonably conceivable state of facts* that could provide a rational basis for the classification."  *Id.* (citations omitted) (emphasis added).  This standard of review is a paradigm of judicial restraint.  *Id.*  "The Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be

rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted." *Vance v. Bradley,* 440 U.S. 93, 97 (1979). Thus, those attacking the rationality of the legislative classification have the burden "to negative every conceivable basis which might support it." *Id.* at 315 (citing *Lehnhausen v. Lake Shore Auto Parts Co.,* 410 U.S. 356, 364 (1973)).

Moreover, because courts never require a legislature to articulate its reasons for enacting a statute, it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature. *United States R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 179 (1980). In other words, a legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data. *Vance*, 440 U.S. at 111. "Only by faithful adherence to this guiding principle of judicial review of legislation is it possible to preserve to the legislative branch its rightful independence and its ability to function." *Lehnhausen*, 410 U.S. at 365 (quoting *Carmichael v. S. Coal & Coke Co.*, 301 U.S. 495, 510 (1937)).

Here, there is certainly a "reasonably conceivable state of facts" that provides a rational basis for the classification of franchisees as large businesses. Two experts, Scott Shane and John Gordon, have provided declarations outlining the economic benefits flowing to franchisees as a result of the franchise relationship. *See* (Shane Decl.) Dkt. # 62; (Gordon Decl.) Dkt. # 70-2. Those benefits include, among other things, national advertising, extremely valuable and well-known trademarks, the market power of a large corporation when purchasing supplies and raw materials, and access to valuable and trustworthy information based on the experiences of other franchisees. Dkt. # 62, ¶¶ 10-17; Dkt. # 70-2, ¶¶ 10-31.

Indeed, the individual plaintiffs in this matter do not deny that their franchise relationships provide them with such benefits. For example, plaintiff Ronald Oh, a

partial owner of a Holiday Inn Express franchise, testified that through his franchise network he receives the use of a large on-line reservation system which provides at least twenty-percent of his hotel's guests; he receives the benefit of a loyalty reward system that has 74 million members worldwide; he is able to consult with others in his franchise network and receive assistance on a host of issues. (Oh Dep.) Dkt. # 87-1, pp. 10-12, 13-14, 15, 16, 21-24. Mr. Oh's franchise agreement identifies other benefits, including use of Holiday Inn's trademarks, training, and certain marketing benefits. (Oh Franchise Agreement) Dkt. # 87-2, pp. 9-11.

Similarly, plaintiff Katherine Lyons, partial owner of a BrightStar Care franchise, acknowledged that her franchisor provided assistance in obtaining an SBA loan; the time-saving ability to receive assistance with various matters from a single source; a network of other franchisees who provide trustworthy business advice and whom she can trust; and a franchise-wide marketing fund. (Lyons Dep.) Dkt. # 87-3, pp. 4, 9, 13-15, 16-17. Ms. Lyons' franchise agreement identifies the use of business software, training, trademarks, and assistance with both opening and operating the business as benefits provided by her franchisor. (Lyons Franchise Agreement) Dkt. # 87-4, pp. 18-19, 21-23, 28-30, 38-39.

A third plaintiff, Charles Stempler, confirmed at his deposition that there are benefits to becoming an AlphaGraphics franchisee, including continuous training and support, lease assistance, buying power via global contracts with major suppliers, management consultation, and ongoing regionalized field and sales support among other things. (Stempler Dep.) Dkt. # 87-5, p. 4; (Stempler Franchise Doc.) Dkt. # 87-6, p. 3. Mr. Stempler's AlphaGraphics franchise agreement also identifies a number of benefits that AlphGraphics has contractually agreed to provide its franchisees including assistance with site selection; advice on financing; detailed plans for a print shop; three to four weeks of training; up to forty-eight hours per year of free consultation; operating

manuals; and use of trademarks.  (Stempler Franchise Agreement) Dkt. #87-7, pp. 16, 17, 19-20, 23-26.

Whether these alleged "benefits" actually put franchisees in a better position to handle the faster phase-in schedule is irrelevant under rational basis review.  As explained above, the court must respect the legislative branch's "rightful independence and its ability to function," and absent some reason to "infer antipathy," the court cannot overstep and replace its judgment for the judgment of lawmakers.  *Lehnhausen*, 410 U.S. at 365.  As long as there was a "reasonably conceivable state of facts" that supported the City's decision, the court must leave that decision alone.  *See United States R.R. Ret.*, 449 U.S. at179 ("Where there are plausible reasons for Congress' action, our inquiry is at an end.") (internal quotations omitted).  If the voters are unhappy, they can, of course, resort to the democratic process.

Here, the facts presented by the two experts, along with the facts drawn from the plaintiffs' individual depositions and franchise agreements confirm that a rational basis exists for the City's decision to classify franchisees as "large" businesses.  Based upon the benefits outlined above, the City could have "reasonably conceived" that franchisees are in a better position than independent small businesses and therefore better able to accommodate the faster phase-in schedule for the minimum wage.  Again, the realistic impact of these "benefits" is not part of the court's inquiry, as the legislature need only show "rational speculation."  *See Vance*, 440 U.S. at 111 ("[A] legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data.").

Notably, no one disputes the City's decision to draw a line defining "large" businesses as any employer with 500 or more employees.  But who is to say an employer with 501 employees has more resources than one with 499?  And who is to say businesses with 501 employees can actually accommodate a faster phase-in schedule?  The court is in no position to answer these questions, nor is the court obliged to do so.

The City Council, based upon its research, review of historical data, legislative hearings, and communications with the public, saw fit to draw the "large" business line at 500 employees. *See Beach Commc'ns, Inc.*, 508 U.S. at 315 ("These restraints on judicial review have added force where the legislature must necessarily engage in a process of line-drawing."). And absent a reason to infer antipathy, the court cannot second-guess the wisdom, fairness, or logic of that choice.

The Ordinance's separate treatment of "integrated enterprises" does not change the court's conclusion. The "state of facts" was sufficient to allow the City to "rationally speculate" that: large businesses (those with more than 500 employees) could handle the faster phase-in schedule because presumably they have more resources; that "integrated enterprises" (separate entities that share a certain degree of common control and in aggregate have more than 500 employees) could handle the faster phase-in because of their additional resources; and franchisees (separate entities that are subject to some level of control by a larger entity and receive certain benefits from that larger entity) could handle the faster phase-in because of that business model. Again, because there is a rational basis for the line-drawing, judicial intervention is unwarranted.

Finally, despite plaintiffs' arguments to the contrary, there is no reason to infer antipathy here. The large majority of statements identified by plaintiffs as showing animus were made by Advisory Committee members and private citizens, not lawmakers. The court has already explained why it gives little weight to such statements, especially when they relate to issues as politically charged as this one. Additionally, the statements by lawmakers distinguished between entities with more resources and those with less resources. When read in context, no protectionist motive was apparent from any of the statements.

Thus, the court finds plaintiffs have neither shown a likelihood of success nor raised serious questions going to the merits of their equal protection claim.

**C. First Amendment**

Plaintiffs next contend that the faster phase-in schedule violates their freedoms of speech and association.  They contend that the Ordinance penalizes franchisees for their association with franchisors and "their decision to engage in protected speech."  (Pls.' Mot.) Dkt. # 37, p. 26.  They allege that the First Amendment protects their right to engage in "coordinated marketing and advertising" and that the Ordinance will curtail this "commercial speech in at least three important respects."  (Compl.) Dkt. # 1, ¶ 169. First, by increasing the labor costs of franchisees, the Ordinance will reduce the ability of franchisees to dedicate funding to the promotion of their business and brands.  *Id.* Second, the increased labor costs the Ordinance mandates may cause some franchisees to shut their doors, reducing the amount of relevant commercial speech they engage in to zero.  *Id.*  And third, the Ordinance will likely cause potential franchisees to forego purchasing a franchise because of the associated higher operation costs.  *Id.*

Plaintiffs' argument is unconvincing.  The Ordinance does not penalize speech or association.  Rather, it uses certain factors common to franchises to identify them as one type of business subject to the faster phase-in schedule.  The definition used by the City here is no different than many other federal and state laws which regulate franchises. *See, e.g.*, 16 C.F.R. § 436.1(h) ("Franchise means any continuing commercial relationship or arrangement…in which the terms of the offer or contract specify…that the franchisee will obtain the right to operate a business that is identified or associated with the franchisor's trademark…"); R.C.W. § 19.100.010(6) ("Franchise means… the operation of the business is substantially associated with a trademark…"); Cal. Bus. & Prof. Code § 20001 ("Franchise means…the operation of the franchisee's business…is substantially associated with the franchisor's trademark…"); N.J.S.A. § 56:10-3 ("Franchise means a written arrangement…in which a person grants to another person a license to use a…trade mark…").  If the court were to accept plaintiffs' argument, it would mean that any regulation that impacts a franchisee's operation costs implicates the

First Amendment because it would necessarily reduce funds that would otherwise be available for "coordinated marketing and advertising" and other forms of commercial speech. Plaintiffs, however, cite no case to support this expansive theory of First Amendment rights.

Indeed, as recognized by the First Circuit, "the mere fact that the joint activities that define the business relationship between the franchisor and its franchisees have some communicative component cannot, in and of itself, establish an entitlement to the prophylaxis of the First Amendment." *See Wine & Spirits Retailers, Inc. v. Rhode Island*, 418 F.3d 36, 51, 53 (1st Cir. 2005); *see also Roberts v. U.S. Jaycees*, 468 U.S. 609, 634, 638 (1984) (O'Connor, J., concurring) ("[T]here is only minimal constitutional protection of the freedom of commercial association," and that in all events, "no First Amendment interest stands in the way of a State's rational regulation of economic transactions by or within a commercial association.").

Accordingly, plaintiffs have not shown a likelihood of success or raised serious questions going to the merits of this claim.

**D. Lanham Act Preemption**

Next, plaintiffs contend that the Ordinance is preempted by the Lanham Act. Though novel and creative, this argument is untenable. Under the Supremacy Clause, U.S. Const., art. VI, cl. 2, when a local law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," it is preempted. *Hillman v. Maretta*, 133 S. Ct. 1943, 1950 (2010). Thus, where conflict is alleged between federal and state law, "the specific purpose of the federal act must be ascertained in order to assess any potential erosion of the federal plan by operation of the state law." *Golden Door, Inc. v. Odisho*, 646 F.2d 347, 352 (9th Cir. 1980) (citing *Mariniello v. Shell Oil Co.*, 511 F.2d 853 (3d Cir. 1975)). Deciphering the purposes of the Lanham Act requires no guesswork, as the Act itself includes an "unusual and extraordinarily helpful"

statement of its purposes.  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1389 (2014).  The purposes of the Lanham Act are to:

> "[R]egulate commerce within the control of Congress by making actionable the deceptive and misleading use of marks in such commerce; *to protect registered marks used in such commerce from interference by State, or territorial legislation*; to protect persons engaged in such commerce against unfair competition; to prevent fraud and deception in such commerce by the use of reproductions, copies, counterfeits or colorable imitations of registered marks; and to provide rights and remedies stipulated by treaties and conventions respecting trademarks, trade names, and unfair competition entered into between the United States and foreign nations."

15 U.S.C. § 1127 (emphasis added).

Nothing in the Ordinance conflicts with these purposes.  As explained above, the Ordinance relies on trademark use as one indicator that a business is a franchise.  This definition is used merely to categorize franchisees and to identify them as subject to the faster phase-in schedule.   Plaintiffs cite no case that holds that such a categorization "interferes" with the use of trademarks in violation of the Lanham Act.

Indeed, there is a presumption against preemption in areas where the states have traditionally exercised their police powers.  *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995).  Here, the regulation of wages is firmly within the local police power.  *See, e.g.*, *RUI One Corp.*, 371 F.3d at 1150 (acknowledging that "[t]he power to regulate wages and employment conditions lies clearly within a state's or municipality's police power.").  To overcome this presumption, plaintiffs must show that preemption was Congress' "clear and manifest purpose."  *Travelers Ins., Co.*, 514 U.S. at 655.  Plaintiffs have made no such showing.

Accordingly, plaintiffs have not shown a likelihood of success or raised serious questions going to the merits of this claim.

ORDER- 34

**E.  ERISA Preemption**

Plaintiffs next contend that certain health plan-related provisions of the Ordinance are preempted by the Employment Retirement Income Security Act ("ERISA").  These provisions allow large employers (those with more than 500 employees), who offer their employees health plans classified as "silver" or "gold" under the federal Affordable Care Act, the opportunity to take advantage of an alternative, more favorable, wage schedule.  Rather than complying with the three year phase-in, these employers will be given *four* years to reach the $15 per hour minimum wage.  Plaintiffs claim that these provisions are preempted because they "relate to" employee benefit plans that are governed by ERISA.  (Pls.' Mot.) Dkt. # 37, pp. 24-26.

This argument, as a practical matter, is not relevant to the pending motion.  The health plan-related provisions simply have no impact on the franchise-related provisions plaintiffs seek to enjoin.  Here, plaintiffs are asking the court to enjoin the provision that requires them to comply with the three year phase-in schedule (Schedule 1) and to compel the City to allow franchisees to take advantage of the seven year phase-in schedule (Schedule 2).  Thus, the validity of this alternative four-year schedule is irrelevant.  Even if the court finds that the health plan-related provisions are preempted by ERISA, that finding will do nothing to advance the relief requested by the franchisees in this motion.

Nevertheless, for the sake of completeness, the court will address plaintiffs' argument.  To begin with, it is important to reiterate that there is a presumption against preemption when the statute under review relates to a matter of local concern, such as the regulation of wages.  *See*, *WSB Elec., Inc. v. Curry*, 88 F.3d 788, 791 (9th Cir. 1996) ("It is well settled that wages are a subject of traditional state concern, and are not included in ERISA's definition of employee benefit plan.  Thus, regulation of wages per se is not within ERISA's coverage.") (internal quotation marks omitted).  Nevertheless, it is possible, under certain circumstances, for ERISA to preempt local wage regulations.

ERISA preempts and supersedes any and all state laws that "relate to" any employee benefit plan. *See* 29 U.S.C. § 1144(a). Recognizing that the term "relate to" potentially had no limits, the Supreme Court narrowed its scope in *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Insurance Company*, 514 U.S. 645 (1995) and *California Division of Labor Standards Enforcement v. Dillingham Construction Company*, 517 U.S. 316 (1997). Under the more narrow construction, the "relate to" criterion is analyzed by determining if the state law: (1) has a "connection with" or (2) a "reference to" employee benefits plans.

    1.  <u>Does the Ordinance Have a "Connection With" an ERISA Plan?</u>

To determine whether a state or local law has a "connection with" ERISA, courts consider (1) the objectives of ERISA and (2) the nature of the impact that the challenged law has on ERISA plans. *Dillingham*, 519 U.S. at 325; *Golden Gate Rest. Ass'n v. City & County of San Francisco*, 546 F.3d 639, 655-56 (9th Cir. 2008).

The objectives of ERISA focus on maintaining a uniform regulatory regime over employee benefit plans. Thus, one purpose of ERISA's preemption clause is to "ensure that the administrative practices of a benefit plan will be governed by only a single set of regulations." *Golden Gate*, 546 F.3d at 655. Accordingly, in considering the nature and impact local laws have on ERISA plans, courts will often find that they have an impermissible "connection with" ERISA if they require employers to have health plans, dictate the specific benefits that must be provided through those plans and/or impose certain reporting requirements which differ from those of ERISA. *Id.*

Here, the Ordinance does not require any employer to provide any ERISA plan; it does not dictate the contents or any administrative requirements for such a plan; it does not have any direct impact on any ERISA plan; and it does not impose reporting, disclosure, funding, or vesting requirements on any ERISA plan.

Accordingly, it does not have an impermissible "connection with" ERISA.

1       2.   Does the Ordinance Have a "Reference To" an ERISA Plan?

2       A statute has an impermissible "reference to" ERISA plans if it acts immediately

3   and exclusively upon the plans or if the plans are essential to the law's operation.

4   *Dillingham*, 519 U.S. at 324-25; *S. Ca. IBEW-NECA Trust Funds v. Standard Indus.*

5   *Elec. Co.*, 247 F.3d 920, 525 (9th Cir. 2001).  Thus, the challenged statute must do more

6   than mention ERISA to be preempted; it must have some effect upon ERISA plans.  *WSB*

7   *Elec., Inc. v.*, 88 F.3d at 793.

8       Here, the Ordinance does not have any effect upon ERISA plans.  It does not

9   require any employer to provide benefits through ERISA plans nor does it dictate the

10  contents of any such plan.  The Ordinance merely allows large employers to take

11  advantage of an alternative four year phase-in schedule if they happen to provide certain

12  benefits to their employees.  Thus, while ERISA plans may be optional under the

13  Ordinance, they are certainly not required or "essential" to the law's operation.  *See, e.g.*,

14  *WSB Elec., Inc*, 88 F.3d at 793 (noting that the statute at issue did not premise any

15  employer obligation on the existence of benefit plans, but instead merely took account of

16  such plans if they happened to exist).

17      Accordingly, the Ordinance does not have an impermissible "reference to"

18  ERISA.

19  **F.  Privileges and Immunities Under Washington State Constitution**

20      Finally, plaintiffs contend that the Ordinance violates the privileges and

21  immunities clause of the Washington Constitution because it infringes on their

22  fundamental right to "carry on business" in Seattle.

23      Article I, section 12 of the Washington Constitution provides:

24          No law shall be passed granting to any citizen, class of
        citizens, or corporation other than municipal, privileges or

25          immunities which upon the same terms shall not equally

26          belong to all citizens or corporations.

27

ORDER- 37

1    Washington courts have often construed article I, section 12 consistent with the

2    federal Equal Protection Clause.  *Ockletree v. Franciscan Health Sys.*, 179 Wash. 2d 769,

3    776 (2014).  However, if the matter at issue is one of particular local concern -- such as

4    the power to regulate wages -- an independent analysis is warranted.  *Grant County Fire*

5    *Prot. Dist. No. 5 v. City of Moses Lake*, 150 Wash. 2d 791, 811 (2004)).  This analysis

6    involves a two-step inquiry.  *Ass'n of Wash. Spirits & Wine Distribs. v. Wash. State*

7    *Liquor Control Bd.*, 340 P.3d 849, 857 (Wash. 2015) (en banc).  The first step is to

8    determine whether the law in question involves a privilege or immunity; if not, then

9    article I, section 12 is not implicated.  *Id.*  If there is a privilege or immunity, the second

10   step is to determine whether the legislature had a "reasonable ground" for granting the

11   privilege or immunity.  *Id.*

12       1.   Does the Ordinance Involve a Privilege or Immunity?

13       Plaintiffs contend that the slower phase-in schedule is a "privilege" that is granted

14   on unequal terms.  (Pls.' Mot.) Dkt. # 37, pp. 31-32.  Although plaintiffs are correct that

15   the slower phase-in schedule favors small independent businesses over other types of

16   businesses in Seattle, plaintiffs fail to show that this benefit is a "privilege" that

17   implicates the Washington Constitution.

18       The privileges and immunities clause is not violated anytime the legislature treats

19   similarly situated businesses differently.[19]  *Am. Legion Post No. 149 v. Dep't of Health*,

20   164 Wash. 2d 570, 607 (2008).  "[N]ot every legislative classification constitutes a

21   'privilege' within the meaning of article I, section 12 but only those where it is, 'in its

22   very nature, such a fundamental right of a citizen that it may be said to come within the

23   prohibition of the constitution, or to have been had in mind by the framers of that organic

24   law.'"  *Ockletree*, 179 Wash. 2d at 778.  As the court found in *Ockletree*,

25

26       [19] The court has already outlined the differences between independent small

27   businesses and franchisees.

ORDER- 38

> Accepting Ockletree's definition means recognizing a
> privilege anytime a statute grants a right to some but not
> others…As a result, we could be called upon to second-guess
> the distinctions drawn by the legislature for policy reasons
> nearly every time it enacts a statute.  For example, the
> property tax exemptions for citizens "[s]ixty-one years of age
> or older" and "veterans with one hundred percent service-
> connected disabilities" could be challenged as
> unconstitutional grants of special privileges to certain classes
> of citizens but not others.  Similarly, exemptions from
> emission control inspections for "[f]arm vehicles," "[s]treet
> rod vehicles," "[h]ybrid motor vehicles," and "[c]lasses of
> motor vehicles exempted by the director of the department of
> ecology," among others, would all be subject to challenge
> under article I, section 12.  RCW 46.16A.060(2)(e), (f), (h),
> (i).  We therefore reject Ockletree's invitation to broaden the
> meaning of the word "privilege" for purposes of article I,
> section 12 and reiterate that a privilege in this context is
> limited to those <u>fundamental</u> rights of citizenship.

*Id.* at 779 (emphasis added).

Plaintiffs insist, however, that a fundamental right is at issue here.  They claim that allowing independent small businesses to phase-in the minimum wage at a slower pace than franchisees infringes upon the franchisees' fundamental right to "carry on business." (Pls.' Mot.) Dkt. # 37, p. 31.  The court disagrees.

Plaintiffs' reliance on *Ralph v. City of Wenatchee*, 34 Wash. 2d 638 (1949) is misplaced.  There, the City of Wenatchee enacted an ordinance that clearly and purposefully discriminated against itinerant photographers.  *Id.* at 638-39, 643.  The ordinance imposed substantial licensing fees on the photographers and prohibited them from soliciting business in public places, private homes, and private businesses (i.e., almost everywhere in the city).  *Id.* at 639-40, 643.  The court found that the effect of these regulations was to "*substantially* prohibit activity of non-resident photographers in the city of Wenatchee."  *Id.* at 642 (emphasis added).  Rather than reasonably regulate the activities of itinerant photographers, the city enacted significant burdens and prohibitions on "what is in itself a completely lawful business."  *Id.* at 644.

Here, nothing in the Ordinance prevents anyone from exercising their right to "carry on business." *See, e.g.*, *Am. Legion*, 164 Wash. 2d at 608 (holding that business regulations that do not "prevent any entity from engaging in business" do not involve a fundamental right). The Ordinance requires all businesses to pay the higher minimum wage. That "large" businesses must pay $1.00 more in labor costs in 2015, $2.50 more in 2016, and $4 more in 2017 does not substantially burden or prohibit those entities from carrying on business in Seattle. Accordingly, the Ordinance does not implicate a "privilege" under the Washington Constitution.

2. Did the Legislature Have a "Reasonable Ground" for Granting the Privilege or Immunity?

Even if the court were to find that the Ordinance implicates a "privilege or immunity," plaintiffs' article I, section 12 challenge still fails because reasonable grounds exist for the distinction between franchisees and small independent businesses. To meet the reasonable ground requirement, distinctions must rest on "real and substantial differences bearing a natural, reasonable, and just relation to the subject matter of the act." *Ockletree*, 179 Wash. 2d at 783. The Ordinance readily satisfies this standard for the reasons previously stated. Franchisees enjoy certain benefits as a result of the franchise relationship and those benefits have recognizable economic value to the franchisees. These benefits support the reasonableness of the Ordinance's distinction between franchises and independent small businesses.

Accordingly, plaintiffs have neither shown a likelihood of success nor raised serious questions regarding the merits of this claim.

**G. Irreparable Harm, Balance of the Equities and Public Interest**

Although plaintiffs have not shown a likelihood of success on the merits of any of their claims, the court will nevertheless address the remaining preliminary injunction factors.

1       1.  Irreparable Harm

2       A preliminary injunction is an extraordinary remedy and to obtain such relief,

3  plaintiffs must demonstrate more than a mere "possibility" of harm.  *Winter*, 555 U.S.

4  at 22.  Indeed, the need to show "substantial and immediate irreparable injury" is

5  especially strong when plaintiffs seek to enjoin the activity of a state or local

6  government.  *Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1042 (9th Cir. 1999)

7  ("The Supreme Court has repeatedly cautioned that, absent a threat of immediate and

8  irreparable harm, the federal courts should not enjoin a state to conduct its business in

9  a particular way.").

10      Here, plaintiffs have not met their burden of demonstrating the requisite

11 irreparable harm.  Although plaintiffs assert that they will suffer competitive injury,

12 loss of customers, loss of goodwill, and the risk of going out of business, Dkt. # 37, p.

13 32, the court finds that these allegations are conclusory and unsupported by the facts

14 in the record.  It is true that "evidence of threatened loss of prospective customers or

15 goodwill" supports a finding of irreparable harm, *Stuhlbarg Int'l Sales Co. v. John D.*

16 *Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001), but that *evidence* is lacking here.

17 Although the court is sympathetic to the concerns of franchisees, the individual

18 plaintiffs' declarations in this matter consist only of speculation.  There is no actual

19 evidence of the alleged negative impacts that plaintiffs fear will occur as a result of

20 the faster phase-in schedule.  *See Oakland Tribune Inc. v. Chronicle Pub. Co., Inc.*,

21 762 F.2d 1374, 1377 (9th Cir. 1985) (discounting conclusory statements concerning

22 irreparable harm made by interested party); *see also Am. Passage Media Corp. v.*

23 *Cass Commc'ns, Inc.*, 750 F.2d 1470, 1474 (9th Cir. 1985) (reversing a preliminary

24 injunction and finding that plaintiff's forecast of large losses was insufficient to show

25 it was "threatened with extinction").

26

27

2.   Balance of the Equities and Public Interest

The balance of the equities and public interest factors also weigh against the entry of a preliminary injunction.  Plaintiffs' harm is speculative and does not outweigh the concrete harm that will be suffered by employees who are entitled to a Schedule 1 increase in their wages under the Ordinance.  When weighing the *imminent* costs to franchisees (*i.e.*, a $1 per hour differential in pay to their employees and other speculative consequential harms) against the concrete harm to those employees in the form of lost income, it is impossible for the court to find that the equities tip sharply in plaintiffs' favor.

Additionally, contrary to plaintiffs' contentions, granting injunctive relief would not maintain the status quo.  Here, the status quo is the Ordinance, which the citizens of Seattle expect to go into effect on April 1, 2015.  The public has an interest in ensuring that laws passed by its legislative body are implemented.  *See, e.g.*, *Golden Gate Rest. Ass'n v. City of San Francisco*, 512 F.3d 1112, 1116  (9th Cir. 2008) (observing that enjoining the implementation of an ordinance would disturb rather than maintain the status quo); *Planned Parenthood of Blue Ridge v. Camblos*, 116 F.3d 707, 721 (4th Cir. 1997) ("[T]he status quo is that which the People have wrought, not that which unaccountable federal judges impose upon them.")

**H. The "Serious Questions" Test**

Finally, the court finds that plaintiffs have failed to satisfy the alternative "serious questions" standard.  *See, e.g.*, *Alliance for the Wild Rockies*, 632 F.3d at 1135 ("'[S]erious questions going to the merits' and a balance of the hardships that tips sharply towards the plaintiff can support the issuance of a preliminary injunction…."); S*ierra On-Line, Inc. v. Phoenix Software, Inc.*,739 F.2d 1415, 1421 (9th Cir. 1984) (noting that a "serious question" is one on which the movant has "a fair chance of success on the merits").  Even if the court were to assume that plaintiffs raised "serious questions" regarding their dormant Commerce Clause claim, as set forth above, they have not shown

that the balance of the equities tips sharply in their favor.  Accordingly, the court cannot grant a preliminary injunction under the alternative standard.

## V. CONCLUSION

For all the foregoing reasons, the court denies plaintiffs' motion for preliminary injunction.  Dkt. # 37.

Dated this 17th day of March, 2015.

The Honorable Richard A. Jones
United States District Judge